[S. F. Nos. 15052–15053. In Bank.—April 26, 1934.]

JOHN D. McNEIL, Respondent, v. EAST BAY STREET RAILWAYS, LTD. (a Corporation), et al., Defendants; THE WESTERN PACIFIC RAILROAD COMPANY (a Corporation) et al., Appellants.

C. W. Dooling and Brown, Ledwich & Rosson for Appellant Western Pacific Railroad Company.

Brobeck, Phleger & Harrison and Chapman, Trefethen, Richards & Chapman for Appellant Key System Transit Company.

Myron Harris, Leo A. Sullivan, William H. Older and John Jewett Earle for Respondent.

THE COURT.—A hearing was granted in this case to enable us to consider more at length the points made on the respective appeals. After such re-examination we are satisfied with the conclusions reached by the District Court

of Appeal and adopt the opinion prepared by Mr. Justice Sturtevant of the First District, Division Two, as the opinion of this court. It is as follows:

"While riding as a passenger on a street car operated by the defendant Key System Transit Company, hereinafter called 'Transit Company', the plaintiff was injured when the car was struck by the engine of the train operated by the Western Pacific Railroad Company, hereinafter called 'Railroad Company'. He sued for damages. He named as defendants both companies and their trainmen who were in charge. The jury returned a verdict in the sum of $35,761 and costs in the sum of $651.68. The defendants have appealed and have brought up one transcript but two sets of briefs.

*"Appeal by Western Pacific Railroad Company and its agents.*

"The accident occurred at the intersection of Twenty-third avenue and East Twelfth street, which intersect each other at approximately right angles, in the city of Oakland, at about 7:25 or 7:30 a. m. (daylight) on May 12, 1930. Twenty-third avenue runs in a general northerly and southerly direction and East Twelfth street in a general easterly and westerly direction. The Transit Company operated its street cars from Oakland to Alameda and *vice versa,* on a set of double tracks on Twenty-third avenue which crossed East Twelfth street. The easterly set of said street car tracks was used for Oakland, or northbound traffic, and the westerly set for Alameda, or southbound traffic. Twenty-third avenue was approximately 38 feet wide from curb to curb. These street car tracks were laid approximately in the center of Twenty-third avenue, were each of standard gauge width, namely 4 feet 7 inches, were 6 feet 3 inches apart, and the most easterly rail of the easterly set of tracks was approximately 12 feet westerly of the easterly curb of Twenty-third avenue and approximately 21½ feet westerly of the easterly property line of Twenty-third avenue.

"Defendant Railroad Company operated both freight and passenger trains, with steam as the motive power, in an easterly and westerly direction on a single set of standard gauge railroad tracks on East Twelfth street, said railroad tracks being a part of its main line of railroad from Oak-

land to Salt Lake City. The railroad tracks were not laid in the center of East Twelfth street, but to the south thereof, the southerly rail thereof being 16.60 feet north of the southerly curb of East Twelfth street, and the northerly rail being 30.65 feet south of the northerly curb of East Twelfth street.

"The street car involved in the collision out of which this case grows was northbound on Twenty-third avenue, proceeding on the easterly set of tracks from Alameda toward Oakland, and was operated by defendant C. R. Jones, an extra man, who was acting as motorman and conductor. He was discharged immediately after the accident. The train was a regular passenger train from Salt Lake City, westbound on East Twelfth street to the Oakland Mole, and consisted of an engine, tender and ten cars.

"At the time of the accident, and for some months prior thereto, there was in operation at the intersection of Twenty-third avenue and East Twelfth street a system of traffic signals installed by the city of Oakland to control vehicular and pedestrian traffic in all directions at the intersection. These traffic signals were lights operated in conjunction with bells, there being such a signal located at each of the four corners of the intersection. The signal on the north side of East Twelfth street immediately west of the property line of Twenty-third avenue showed its signal to westbound traffic on East Twelfth street (the direction in which the train was proceeding). The signal on the northeast corner showed its signal for northbound traffic on Twenty-third avenue (the direction in which the street car was proceeding). Each traffic lantern had a red, amber and green light in it, the red signaling for traffic to stop, the amber that pedestrians might proceed, and the green that all traffic might proceed. The traffic lights were synchronized to the extent that while the amber and green were showing at the northeast corner for northbound traffic on Twenty-third avenue, a red light would be showing for east and westbound traffic on East Twelfth street and *vice versa*. The green light for traffic on Twenty-third avenue showed for twelve seconds, during which time and for four additional seconds, while the amber preceding this green was showing, a red light would show for traffic on East Twelfth street, making a total showing of the red light for traffic on East

Twelfth street of sixteen seconds in all, provided no train passed over the contact point (hereinafter described) during said sixteen seconds. The normal period for the red signal for traffic on Twenty-third avenue was twenty-nine and a half seconds, during which time the amber showed three and one-half seconds for traffic on East Twelfth street and the green twenty-six seconds for traffic on East Twelfth street.

"After the traffic signals were installed, an additional device, operated by trains on said railroad track, was added thereto, so that when the pony, or front, wheels of an engine of a west bound train reached a point on said railroad tracks two hundred and twenty feet east of the most easterly rail of the street car tracks, the train was given control over all traffic signals at the intersection. At this point, two hundred and twenty feet distant as aforesaid, there was installed on the railroad tracks a contact point, or insulated joint, frequently referred to in the testimony as a 'tripper' which operated on these traffic signals so that when the pony wheels of the engine passed over the railroad tracks at this point, this contact caused the traffic signals at the intersection to instantly show a green light, or proceed signal, to the engineer on the train and for all east and westbound traffic on East Twelfth street, and at the same time caused the traffic signals for Twenty-third avenue traffic to instantly show a red light, or stop signal, for all traffic on Twenty-third avenue, regardless of what the signals were prior thereto, and also caused all bells in the light signals to start ringing. The only delay that could occur would be by the operation of the insulated joint, which took only a fraction of a second to operate. Under the signal system, the light remained green for the train and red for Twenty-third avenue traffic, and all bells in the traffic signals rang until the rear wheels of the last car of the train crossed the intersection. In other words, in addition to any other warning given by the train to north and southbound traffic on Twenty-third avenue, when the pony wheels of the engine reached this insulated joint the traffic signals turned red for Twenty-third avenue traffic and the bells therein began to ring. The obvious purpose of this signaling system was to give the train the right of

way over all traffic at the intersection, and to give warning of its approach.

"Prior to the installation and location of this contact point, a field inspection was made by the engineers of the railroad commission, the electrical and police departments of the city of Oakland, and the Western Pacific Railroad Company, and its location fixed after such field inspection. After its installation, another field inspection was made to see how the signals operated, and the location and installation of the contact point and its control over the traffic signals at Twenty-third avenue was approved by the railroad commission and the city of Oakland several months prior to this accident.

"The aforesaid distance of 220 feet was fixed so that a train could stop, if necessary, between the contact point and Twenty-third avenue, and it was decided that this was a safe distance for traffic on Twenty-third avenue to clear the railroad tracks. A maximum speed of fifteen miles an hour for trains between this contact point and the street car tracks was determined upon at the time of installation.

"The street car stopped south of the east curb of Twenty-third avenue, or in the normal place for it to stop. Estimates of the witnesses of the distance that the front of the street car stopped from the nearest rail of the railroad tracks varied from about 20 feet, fixed by the fireman, to 30 to 35 feet fixed by the motorman and other witnesses. The street car remained stopped at this place from something over half a minute to a minute. It was about a minute ahead of time during which time the motorman waited until it was time for him to start. The signal for Twenty-third avenue traffic was green for the street car while it was stopped, but, being about a minute ahead of time, the motorman waited until the signal again turned to green (the time from one green signal to another for him was twenty-nine and one-half seconds). He then proceeded 'very slowly', and estimated his speed from the time he started until he saw the train as 'something like two miles an hour'.

"Defendant A. W. Fuller, who was the locomotive fireman, was riding in the cab on the left side of the engine. His deposition was taken and read in evidence. He testified on his deposition that when he was about 200 or 250

feet east of the easterly rail of the street car tracks, he first saw the street car, standing still, slightly back of the curb line on East Twelfth street—three or four feet. At that time, he could see about two-thirds of the intersection from the southerly curb toward the north. At that time there was 'plenty of traffic on East Twelfth street', and from that time until the time of the collision there was no northbound or southbound traffic on Twenty-third avenue, either pedestrian or vehicular. After seeing the street car stopped, as aforesaid, the fireman did not continue to observe it at all times, but looked directly ahead, watching for automobile traffic, and he next saw the street car 'just after it started to move'. He estimated the front of the engine was then about 75 to 100 feet east of the square formed by the crossing of the railroad tracks and the street car tracks, and that the street car had then moved about four feet, or was about even with the southerly curb line of East Twelfth street, and was just barely in motion. He continued to observe the street car from that time until it was hit by the locomotive. He could also see the motorman who did not look toward the fireman up to the time of the collision. His best judgment was that the street car did not average more than three or four miles per hour from the time he first saw it moving until the collision. When he noticed the street car moving into his line of travel and that the motorman was not looking in the direction of the approaching train, he immediately called to the engineer to 'plug her', and the instant he did so the emergency brakes were applied.

"The fireman stated in his deposition that when he first saw the street car moving, he waited 'for a little time' before he called to the engineer to 'plug her'. On his deposition, he also testified that after he noticed the street car moving, he noticed the motorman in 'a matter of a second', and as soon as he observed that the motorman was not looking, he hollered to the engineer 'plug her'. He estimated that from the time he first saw the street car moving until he called 'plug her', the train traveled 'probably 25 feet or less'. Although the fireman knew the street car was moving, he did not believe it was going to cross the track in front of the train.

"On the trial the fireman estimated that the street car traveled from four to six feet during the second's time that he observed the motorman looking away from the train before he called to the engineer to 'plug her'; but he also testified on the trial: 'How far the car traveled is just guess work on my part.' He also testified on the trial that the best he could fix the location of the front of the street car when he called to the engineer to 'plug her' was that it was somewhere between the curb and a distance of from four to six feet from the railroad tracks. He stressed that it was almost impossible for him to do other than guess at distances, and in this connection gave this answer: 'It is almost impossible to measure distance sitting in the cab of a locomotive going along a street that is full of traffic which is liable to come in contact with the train at any time.' He also testified on the trial that from the time he observed the motorman until he called to the engineer to 'plug her' was like the time that it takes for the snapping of fingers, saying in this regard: 'The little time that I noticed the motorman was not looking was like that (snapping fingers). I never came to the conclusion that he was going to cross the track.'

"Altogether the engineer immediately applied the emergency brakes upon receiving the call from the fireman to 'plug her'; it was then impossible to stop the train before the engine reached the street car tracks; so the engine struck the street car approximately in the middle thereof and shoved the rear end of it off its track a distance of somewhere between 25 and 35 feet.

"From the time the emergency brakes were applied, the train traveled 80 or 85 feet, which was a 'very good stop' for a train going 12 miles an hour.

"The street car was 45½ feet long, not including the fender. The fireman estimated the time that the street car was standing still from the time he first saw it until he saw it moving as about seven seconds. The street car at no time increased its speed.

"These defendants claim they were not negligent. We think there is no evidence that they were. It is not claimed that there was any act of negligence unless the engineer or the fireman was negligent. As to the engineer it is clear that he was at his post of duty and duly attentive. There

is not a particle of evidence that any stop signal or sign of danger was seen or could have been seen by him, or that he could have seen the street car. As to the fireman he was at his post of duty and duly attentive. It is true he saw the street car and saw its movements. Considering all of the facts as recited above, nothing shows or tends to show that he was negligent. He was not called upon to stop the train nor to notify the engineer until he became aware that the street car was actually going to attempt to cross the track in front of the oncoming train. When the fireman was exercising due care regarding the agency which he was helping to operate he had the right to assume that the motorman in charge of the street car would exercise due care and would not actually attempt to cross the track. (*Young* v. *Southern Pac. Co.*, 189 Cal. 746, 754 [210 Pac. 259]; *Green* v. *Los Angeles etc. Ry. Co.*, 143 Cal. 31 [76 Pac. 719, 101 Am. St. Rep. 68].) When, thereafter, he came to a realization that the motorman was going to make said attempt the fireman acted promptly. But it was then too late. Be that as it may, such facts do not show negligence on the part of any one of these defendants.

By reason of our conclusions on the point just discussed it is unnecessary to discuss other points presented by these defendants.

"*Appeal by the Key System Transit Company.*

"This defendant contends it was not negligent. It called C. R. Jones who was acting as motorman of the defendant's car at the time of the accident. He testified that shortly prior to the accident he had come to a stop on the south side of the steam railroad track. He was ahead of time and paused for a short time. He was operating a one-man's car and the front door was standing open. He was seated and was looking up the track in the direction from which the train later appeared. He saw no train and he heard no bell or whistle. When it was time to go he waited for the corner automatic signal. When it showed green he closed the door, started to move forward, and turned his head to the left and continued looking in that direction because high buildings on that side narrowed the scope of his vision. With his eyes turned to the left he continued to advance until he was on the track. He then looked to his right. The train was nearly on top of him.

He advanced the spark and attempted to speed across. The uncontradicted facts are that from the point where his car was when the motorman was looking' east up the track of the Western Pacific, the track is visible for 730 feet and that the whistle was blown just before the train came on to East Twelfth street—two blocks distant. Thereafter, the automatic bell on the engine was ringing continuously. After the engine crossed 'the tripper' the bells in the automatic street signals rang continuously. For .the safety of the plaintiff (a passenger in his car) the motorman was bound to exercise the utmost care. We cannot say the evidence showed that he did so.

"It is also claimed that the cause of the accident was the negligence of the Western Pacific Railroad Company. In view of what we have stated above it is not necessary to dwell further on that claim.

■ "Finally, it is claimed that the damages are excessive. The point is presented under three headings. It is said 'that when viewed in the light of similar cases involving equally serious injuries, the earning power of money, and the tremendously increased purchasing power of money, the damages are so excessive as to necessitate the conclusion that they were .the result of passion or prejudice on the part of the jury'. That this court should consider the rulings in similar cases involving equally serious injuries has been held. (*Maede* v. *Oakland High School Dist.*, 212 Cal. 419, 425 [298 Pac. 987].) No doubt it should also consider the earning power of money and its increased purchasing power. ■ But when we come to apply said rules to this case we are stopped by the facts developed at the trial. The accident occurred May 12, 1930. The plaintiff's back was broken. He was taken to a hospital. A cast was placed on his body extending from the nipple line to the knee on the left side and to the groin on the right side. The plaintiff was compelled to lie on his back from eight to ten weeks. The bones did not knit. When the cast was removed it was replaced by a steel spinal brace which he was wearing at the time of the trial and without which he could not walk at that time. The break of the vertebra lighted up a chronic arthritic condition which had been dormant and painless. Attendant consequences included a sacroiliac slip, inflammation of the sciatic nerve, and an

enlargement on one leg. The plaintiff testified that from the date of the accident to the date of the trial he suffered excruciating pain, that he suffered insomnia, was becoming neurotic, and that since the accident he had not had anything like a good sound night's sleep. Special damages in the sum of $4,000 were proved. The trial was held nineteen months after the accident. It thus appears that the evidence before the jury was such that it was within its rights in making a most substantial award. The defendant argues that if this verdict is not excessive then if it had been rendered in 1927 the amount should have been $61,000 and more. Perhaps so. On the other hand the plaintiff may argue that if it had been rendered in 1911 it would not have been excessive (*Zibbell* v. *Southern Pac. Co.,* 160 Cal. 237 [116 Pac. 513]), and that it is not now. We think we are. not entitled to say the verdict, under the facts as shown by the evidence, was excessive.''

The judgment as to the defendants, Western Pacific Railroad Company, a corporation, H. L. Davis, and A. W. Fuller, is reversed. The judgment against the defendant, Key System Transit Company, a corporation, is affirmed.

Rehearing denied.