[Civ. No. 10494. First Appellate District, Division One.—February 16, 1939.]

FRANK FORMOSA, Respondent, v. YELLOW CAB COMPANY (a Corporation) et al., Appellants.

Walter H. Linforth, William M. Cannon and Jesse H. Miller for Appellants Yellow Cab Company et al.

Christopher M. Bradley and Cooley, Crowley & Supple for Appellants Gilboy et al.

Elmer P. Delany for Respondent.

THE COURT.—The respondent, Frank Formosa, recovered a judgment against the defendants, Yellow Cab Company, and its employee, Thomas C. O'Brien, and Thomas W. Gilboy, transacting business under the firm name of Gilboy Co., and his employee, Henry Lane, for the sum of $25,000.

At about 12:45 A. M., on the morning of May 8, 1936, the respondent, Frank Formosa, engaged a taxicab owned and operated by the Yellow Cab Company and being driven by Thomas C. O'Brien, to convey him from the Mission district in the city of San Francisco to Larkin and Turk Streets in said city. The taxicab was proceeding northerly on Larkin Street and on the easterly side of the north-bound street car rails; but just prior to reaching the intersection of Larkin and McAllister Streets the defendant O'Brien turned slightly to the left so that the wheels of the taxicab were astride of

the easterly rail of the north-bound track. Larkin Street extends in a general northerly and southerly direction, and McAllister Street extends in a general easterly and westerly direction; the distance between the east rail of the north-bound car track and the east curb of Larkin Street south of McAllister Street is 23 feet 4 inches, but to the north of McAllister street is 14 feet 6 inches. The truck of the defendant Gilboy, driven by the defendant Henry Lane, was traveling southerly on Larkin Street and at the intersection with McAllister Street made a left-hand turn and collided with the taxicab in which the respondent was riding. The record discloses without any conflict that there were no turning markers at this particular intersection at the time of the accident. As a result of the accident the respondent received injuries consisting of lacerations of the scalp, a fracture of the sternum, a compound comminuted fracture of the right femur, compound fracture of the right tibia, a laceration of the chin and a possible skull fracture. He was rendered unconscious as a result of the collision, and at the time of the trial could recall no happenings either immediately prior to the actual impact nor subsequently thereto until after he had been in the hospital. The taxicab was proceeding at a rate of speed between 15 and 20 miles an hour, and did not at any time slacken or reduce its speed; the truck of the Gilboy Co. was traveling at approximately the same rate of speed as was the taxicab; the night was clear; both machines had their lights on and the street lights at that intersection added to the visibility; the defendant O'Brien testified that he did not see the truck driven by Lane until the instant before the collision. Lane testified that he did not see the taxicab until he was but a few feet away from it, and that it was then too late to avoid the collision. An east-bound street car was approaching on McAllister Street and stopped at the loading zone on the westerly side of Larkin Street. There is testimony to show that the taxicab driver was watching the street car to see if it was going to stop before proceeding across McAllister Street, and the truck driver was endeavoring to beat the street car into the intersection and to proceed easterly on McAllister Street ahead of the street car. There was a loading zone 54 feet in length and 6 feet in width on the easterly side of the north-bound rail of Larkin Street.

It is the contention of the respondent that the concurrent negligence of the defendants caused the collision resulting in his injuries.

From a verdict in favor of the respondent and against all of the named defendants the said defendants have respectively appealed. Each of the appellants, by the appeal, attempts to justify and excuse its own actions and accuses each other. The appeals were separately taken by the Yellow Cab Company and by the Gilboy Co. The appellant Thomas C. O'Brien perfected a separate appeal, but it is predicated upon the points and authorities submitted by the appellant Yellow Cab Company, and raises but one point not therein discussed. It will be necessary for us to consider the points raised by the several appellants separately. We will first consider the appeal by the Yellow Cab Company.

The trial court admitted in evidence as Gilboy's and Lane's exhibits No. 8 and No. 9, two letters written by the representative of the insurance carrier of Gilboy and Lane to a claims adjuster of the Market Street Railway Company. These letters are in the words and figures following:

"San Francisco, California. May 23, 1936. Mr. J. H. Handlon, c/o Market St. Railway Co., 58 Sutter Street, San Francisco, California. Dear Mr. Handlon: It will be remembered that several weeks ago I called in at your office to see if you would be kind enough to let me have the name of the motorman who was a witness to the accident that occurred at the corner of McAllister and Larkin streets, in which a Yellow Cab and a truck of one of our assured, the Gilboy Company, was involved and in which an occupant of the Yellow Cab was badly injured. You stated at that time that you were going to look this up and also that the Yellow Cab Co. had made an inquiry along these lines. I am wondering if you have had any success in locating the motorman, as I am very anxious to talk with him. Thanking you for past favors, I remain, Yours very truly, S. Dodge S. Dodge, Dist. Claims Mgr."

"San Francisco, California, August 28, 1936. Mr. J. H. Handlon, c/o Market Street Railway Company, 58 Sutter Street San Francisco, California. Re: SF 1993—*Formosa* v. *Gilboy* Dear Mr. Handlon: It will be remembered that you were kind enough to forward to my office a copy of the motor-

man's statement of an accident which he witnessed, and which occurred at the corner of McAllister and Polk Streets, on the night of May 8, and in which a taxicab and a truck collided. I have now been informed by our attorneys that this case has been set for sometime the middle of September, and I am wondering if you would be kind enough to now give me the name and address of the motorman and allow me to use him when this matter comes to trial, and in return for that I will be more than pleased to take care of this man's expenses while he is away from work. The case in question is as you know, the passenger in the cab suing the Yellow Cab Company and our assured, the Gilboy Company, and I believe that the motorman's testimony would be very valuable to us. Thanking you for past favors, I remain, Very truly yours, S. Dodge, Dist. Claims Mgr.''

The statement mentioned in these letters was not introduced in evidence. It was, however, offered as an exhibit for identification and received for that purpose but for no other purpose.

These letters have no evidentiary value. They refer only to a statement alleged to have been made by the motorman on the McAllister Street car with reference to the speed at which the taxicab was traveling immediately prior to and at the time of the accident. The motorman was present in court and testified as to the speed at which the taxicab was traveling. His testimony was beneficial to this appellant, and the effort of the appellant Gilboy Co. to impeach his testimony could most certainly not be predicated upon anything contained in these letters. While the letters have no evidentiary value and should not have been received in evidence, we fail to see where any right of the appellant Yellow Cab Company was prejudiced by reason of their introduction. Appellant contends that the introduction of these letters laid the foundation for an argument to the jury that would tend to impeach the testimony of the motorman. This construction has never been a controlling factor with the triers of fact who are presumed to be influenced only by the pertinent evidence or testimony introduced during the trial. The introduction of said letters under the circumstances existing in this particular case could not be misleading nor have influenced the jury to the detriment of the appellant. The

coappellant, Gilboy Co., endeavored to impeach the testimony of the motorman. This they had a legal right to do. The basis of the impeachment lay in the presentation of a contrary statement made at another time. In order to determine if such contrary statement was made, a foundation for the introduction of the statement (Gilboy Co.'s exhibit No. 5 for identification) had to be laid, and this foundation was their exhibits No. 8 and No. 9. The trial court could not anticipate the value of exhibit No. 5 for identification. No motion to strike the letters from the record was made. The attempted impeachment failed, and the letters standing alone were of no evidentiary value, and this appellant's rights were not prejudiced thereby.

■ The second point raised by this appellant is that the court erred in refusing to give specific instructions requested by appellant, based on its theory of the case, where that theory clearly had support in the evidence.

The specific instructions complained of were requested in amplification of the provisions of the Vehicle Code. Appellant had submitted to the trial court, in the form of instructions, certain enumerated sections of the Vehicle Code, and these instructions were given by the trial court. The Motor Vehicle Act and its successor the Vehicle Code were passed by the legislature primarily for the purpose of guiding the motoring public. The language is plain and concise, and not couched in legal verbiage that is baffling to a juror. Under such circumstances, the giving of explanatory, or as they are here termed, specific instructions as to the legal effect of the wording used, is not mandatory upon the trial court. Instructions based on code provisions should follow the wording of the particular section involved, and when confusing or couched in legal terms should be explained, but when the language of the section is unambiguous and clearly stated without legal embellishments, no explanatory instructions are necessary. It is incumbent upon the trial court to determine whether or not a code section should be explained.

■ This appellant requested the court to instruct the jury that the Yellow Cab Company was not an insurer of the safety of the respondent herein. A careful examination of the instructions, which are quite voluminous and cover all phases of the case, reveals that the trial court clearly and

specifically set forth the basis of liability of this appellant. The trial court having properly instructed the jury upon the duties and liabilities of this appellant, fully complied with all legal requirements of this state. There is no testimony showing or attempting to show that this appellant was an insurer, and such an instruction therefore could not be considered as pertinent to the issues and proof involved herein.

The respondent herein was a passenger for hire in a taxicab owned and operated by this appellant. He had no warning or foreknowledge of this particular accident. He was seated in the taxicab in the place allotted for passengers and was paying no attention whatsoever to matters regarding traffic, relying entirely upon the driver of the taxicab. He was rendered unconscious by the accident and at the time of trial had no recollection whatsoever of any of the happenings immediately preceding or following the accident. Under these facts the doctrine of *res ipsa loquitur* applies. ''Where that which causes an injury is under the management and control of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management and control use proper care, it affords reasonable evidence, in the absence of explanation, that the accident is the result of the want of care.'' (9 R. C. L., p. 1259; 20 R. C. L., p. 185.) In the instant case the respondent was riding in the taxicab, having agreed to pay his fare or hire for the use of the taxicab to the destination that he had given to its driver. He had the absolute right to assume that he would be safely conveyed to his destination; the taxicab was under the control and management of the defendant O'Brien, and O'Brien was the sole and only person in charge of the taxicab at that particular time; the happening of the accident was not in the ordinary course of things so long as the operator thereof used proper care. It was impossible for the respondent to know or determine whether proper care was used; and it therefore became necessary for the appellant herein to show that the accident was the result of the negligence of some agency other than O'Brien. Three courses were open to the jury in reaching their verdict: (1) The jury could find that the sole cause of the accident was the negligence of defendants Gilboy Co. and Lane; (2) the jury could have determined, as in fact they did determine, that

the accident was caused by the concurring negligence of all appellants; or (3) that the negligence of O'Brien was the sole, proximate cause of the injuries sustained by the respondent. Under the last theory a proper instruction on the doctrine of *res ipsa loquitur* was proper. The burden rested with the jury and the court was justified in submitting the question of negligence to them.

The appellant O'Brien, in addition to the points raised by his employer, Yellow Cab Company, contends that the trial court erred in refusing an instruction based upon section 544 of the Vehicle Code. The proposed and refused instruction would have added nothing to the conclusion arrived at by the jury. It may have tended to show negligence upon the part of appellant Lane, but would not have relieved this appellant from the negligence found against him. The refusal, under the circumstances, was harmless.

Both of these appellants and the coappellants have raised the question of excessive damages, and we will discuss this phase of the case at the conclusion hereof. We will now discuss the appeal of Thomas W. Gilboy, Gilboy Co., and Henry Lane, pertaining to the contentions made by said appellants herein.

Upon the conclusion of the case and while giving the instructions to the jury, the trial judge attempted to explain to the jury, upon the diagram presented in evidence, a factual demonstration of the intersection at Larkin and McAllister Streets. After several attempts to demonstrate the boundaries of the intersection the trial judge came to the conclusion that anything he might state with reference to such intersection would be confusing to the jurors and thereupon instructed them to disregard entirely his attempted delineation of the intersection. A legal definition of an intersection was later given by the court, after he had directed the jury to disregard entirely his former statements. In our opinion the giving of a proper instruction and the direction to disregard former statements by the trial judge obviated any error that might have been committed. Under the facts of this particular case it was incumbent upon the jury to determine whether the intersection at Larkin and McAllister Streets was an obstructed or "blind" intersection. A proper definition of an intersection according to the Vehicle Code

had been given to the jury by the trial court. The particular intersection involved was one that was indeed very difficult to define, and more or less confusing. It became a question of fact for the jury to determine whether or not this particular intersection was an obstructed intersection, and the finding of the jury upon this question would determine the speed at which vehicles approaching both from the north and from the south should travel. It was therefore proper for the trial court to instruct the jury as to the relative speed limits in approaching an intersection that was obstructed and also approaching the same intersection where the view was not obstructed. The court had definitely instructed the jury to disregard any and all statements made by the court with reference to the factual conditions surrounding the intersection, and this instruction obviated the necessity of making any other definition than the one given by the court as set forth in the Vehicle Code.

These appellants contend that there were no markers of any kind at the intersection of Larkin and McAllister Streets. They further contend that the city ordinance of the city of San Francisco required the placing of turning markers at all intersections, and that north of McAllister Street on Larkin Street each of the intersections was marked with turning markers. They offered to show that on the intersections north of McAllister Street such markers did in fact exist, but this line of testimony was excluded by the court. We believe that its exclusion was proper, and that the sole question to be determined by the jury was whether or not there were markers at the intersection of Larkin and McAllister Streets and if so whether these markers were observed by the defendant Lane in driving his truck in a southerly direction and making a left turn on to McAllister Street. The ordinance of the city of San Francisco was offered and rejected by the court. It is of no moment as to what the ordinance might be or might have been; it was incumbent upon the driver of the truck to observe the markers, and if no markers were stationed at that particular intersection, then to comply with the state law applicable thereto.

As a matter of justification for the turn made by the defendant Lane, these appellants contend that there was an object placed in the street at almost the same position that

a turning marker would be placed, which was mistaken by the driver of the truck for a turning marker. The truck driver had, according to his own testimony, traversed that particular intersection many times—as many as fifty times, and knew, or should have known, that the object allegedly mistaken by him as a turning marker was in fact a cover placed by the San Francisco Police Department over a hole used for the placing of posts as guide lines on special occasions. The defendant Lane's testimony, however, does not bear out the contention of appellant herein, as it shows that Lane in operating his truck merely assumed, or presumed, that there was a marker along the northerly line of McAllister Street and in the center of Larkin Street. There is no definite testimony that the defendant Lane mistook the posthole cover for a marker. The city of San Francisco may have been negligent in not placing turning markers at the intersection of McAllister and Larkin Streets, but such an omission upon the part of the city is no justification or excuse to the appellant for failure to observe the state law. The exclusion of the city ordinance was proper, and to have admitted the ordinance in evidence would have been erroneous. It has no application to the facts and circumstances of the instant case.

The final contention made by all appellants is that the amount of damages awarded is grossly excessive. It is well settled, however, that the question of whether the amount of damages awarded by a jury is excessive is committed largely to the discretion of the trial court, and that its determination of the question may not be set aside on appeal unless it appears that the award is so disproportionate to the injuries received as to indicate that the award was the result of passion, prejudice or corruption on the part of the jury. (*Mohn* v. *Tingley,* 191 Cal. 470 [217 Pac. 733]; *Hale* v. *San Bernardino Valley T. Co.,* 156 Cal. 713 [106 Pac. 83]; *Hamilton* v. *Hammond Lumber Co.,* 13 Cal. App. (2d) 461 [56 Pac. (2d) 1257]; *Holden* v. *Patten-Blinn Lumber Co.,* 7 Cal. App. (2d) 220 [45 Pac. (2d) 1037].) It is also well settled that in determining the question the reviewing court may take into consideration the amounts awarded in similar cases involving equally serious injuries (*McNeil* v. *East Bay Street Rys., Ltd.,* 220 Cal. 591, 600 [32 Pac. (2d)

598] ; *Maede* v. *Oakland High School Dist.*, 212 Cal. 419 [298 Pac. 987]), and also the changing conditions in the purchasing power of money (*O'Meara* v. *Haiden,* 204 Cal. 354 [268 Pac. 334, 60 A. L. R. 1381] ; *Sim* v. *Weeks,* 7 Cal. App. (2d) 28 [45 Pac. (2d) 350] ; *Rowe* v. *Rennick,* 112 Cal. App. 576 [297 Pac. 603] ; *Criss* v. *Angelus Hospital Assn.*, 13 Cal. App. (2d) 412 [56 Pac. (2d) 1274]), and that the mere fact that the amount of the award may be larger than would have been made by the reviewing court, if the assessment of damages had been within its province, is not ground for disturbing the verdict (*Collins* v. *Jones,* 131 Cal. App. 747 [22 Pac. (2d) 39] ; *Morgan* v. *Southern Pac. Co.*, 95 Cal. 501 [30 Pac. 601] ; *Bennett* v. *Hardy,* 108 Cal. App. 473 [291 Pac. 903]).

 Here the evidence shows that respondent's injuries were of a most serious character, extremely painful, required a great deal of surgical treatment, and left him in a permanently crippled condition. They consisted mainly of multiple, compound, comminuted fractures of the bones of the upper and lower right leg, and of the knee joint, a crushed chest, skull injuries and numerous lacerations on the chin, forehead and scalp. The thigh bone was badly broken and splintered in several places, and the lower third thereof protruded through the flesh. Higher up on the leg a piece of bone three inches long was found in a horizontal position, and at the lower end the condyles forming the knee joint were split into three parts. There was likewise a compound comminuted fracture of the larger shin bone; and the periosteum was badly torn. The chest injury consisted chiefly of a fracture of the largest, strongest part of the breast-bone and a possible fracture of a rib; and as a result of the skull injuries respondent suffered from cerebral concussion.

Immediately following the accident respondent was taken in an unconscious condition to the Central Emergency Hospital, and the surgeon in charge pushed back the protruding thigh bone as far as he could, applied a sterile dressing, splinted the leg, cleansed the numerous flesh wounds, stopped much of the flow of blood, and sutured the wounds. Respondent was then removed to the San Francisco general hospital, where an attempt was made by means of an open operation to reduce the compound fractures and put in place the broken parts of the bone. The operation consisted in part of laying the bones

of the knee bare, removing the fragmentary parts of the knee joint, washing them in sterile solution, cutting away much of the injured tissues and replacing the broken parts. The leg was then placed in a "Thomas splint" with a "Pearson attachment" and a "Matthews' pin and stirrup" which was connected with a pulley at the end of the bed and weights attached for countertraction; and in order to place the Matthews pin it was necessary to drill a hole through the bone of the leg two inches below the knee. A few days later respondent was encased in a complete body cast extending from the middle chest to the heels, and removed to Mary's Help Hospital. There he was attended by two specialists, who operated on four different occasions. Three of the operations consisted of manipulations of the leg. The other was an open operation, which was postponed until the last because of possible infection. Meantime respondent was stricken with bronchial pneumonia, which was much aggravated by the fractured breast-bone, and the body cast. The first manipulation operation was extremely painful, because respondent's bronchial affliction would not permit the giving of any anaesthetic; consequently it was necessary to restrain him by physical force. The operation consumed nearly two hours, and consisted in part of tightening up the traction wire through the shin bone so as to make it taut and rigid. The apparatus was then fixed by lateral compression, using hands and clamps to mould the fractures down in place. Respondent was then placed in a plaster body cast extending from the chest down, the leg being locked within the cast. The second manipulation operation was performed under anaesthetic about ten days later. The sutures and wire were removed from the shin bone to prevent infection, and further attempt was made to mould the fragmentary bones together, and respondent was again locked in a cast in the same fashion, from the chest to the heels. The third manipulation operation took place about three weeks later, at which time callus was present in the knee joint; and an attempt was made to bend the fractures of the bone in proper position. It was discovered, however, that several of the fractures were caught in the muscles, and it became necessary to perform an open operation, which took place about six weeks after the third manipulation. Many of the fragments which were found sticking close to the skin were removed; but further operation for the realign-

ment of the bones was then abandoned because of the profuse bleeding of the bone itself, which could not be stopped by clamps. Thereupon a "capsule sliding operation" was performed, which consisted of running up the capsule of the knee joint and sliding it past the roughened area without getting into the joint. Following this last operation a splint was applied and counterweight balance traction provided by means of a pulley to work the knee; and about a month later the leg was placed in a cast and respondent was allowed to go about on crutches.

As to the permanent character of the injuries, the medical testimony shows that due to the total destruction of the crucial ligaments of the knee joint, the disarrangement of the bones thereof, the distribution of the articulate surfaces and change in the weight-bearing line, respondent will always have a "very unstable knee", and for the rest of his life will be compelled to wear a leg brace and go about with the aid of crutches or a cane; and that if he does not do so greater disability will result. It also shows that osteomyelitis might develop at any time within several years. The medical testimony further shows that at the time of trial, which took place five months after the accident, the knee was abnormal and there was great danger of the deformity increasing in time; that on account of the unstable condition of the knee respondent will never again be able to follow his occupation as chef, nor do any other kind of work which will require standing or walking; that the right leg is three inches shorter, and that there will be a permanent loss of flexation of about 45 per cent. Respondent was able to attend the trial, but at that time he was still under medical treatment at the hospital, and totally incapacitated from performing any work; and according to the medical testimony such total incapacity would continue for more than a year, and thereafter that he would suffer partial disability to the extent hereinabove stated. ·

At the time of the accident respondent was 40 years of age, married, and the father of three minor children. He was steadily employed as a chef, and his weekly earnings were $42 a week; and his life expectancy was 28 years. His special damages up to the time of trial amounted to $4,377.79, of which $3,285.79 was incurred for doctors' fees and the cost of hospitalization. The balance represented loss of wages.

It appears, therefore, that the jury awarded him approximately $20,623 for pain and suffering, permanent injuries, loss of future earnings, and cost of future medical services and hospitalization; and in view of the facts above narrated there would seem to be no legal ground upon which it may be reasonably held that the amount awarded is so grossly disproportionate as to indicate the existence of passion or prejudice on the part of the jury.

The judgment is therefore affirmed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 18, 1939.