*774
 
 Opinion
 

 HUFFMAN, Acting P. J.
 

 Defendants Eugene T. Smith (Smith or Mr. Smith) and his wife, Nenita M. Smith (Mrs. Smith), appeal the judgment for compensatory and punitive damages and attorney fees awarded against them after a jury trial on a complaint by plaintiffs Stephanie Brown (Brown or Mrs. Brown) and her husband, Lewis Brown (Mr. Brown), former tenants at the Smiths’ apartment building. Plaintiffs alleged Smith, their landlord, sexually harassed Brown in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code,
 
 [2]
 
 § 12900 et seq.), and in violation of the Unruh Civil Rights Act (Civ. Code, §§51, 52) (the Act), and that this conduct was negligent and caused Mr. Brown loss of consortium damages. Finding against the Smiths on all theories, the jury awarded Brown $110,000 general damages, $68,000 punitive damages, attorney fees of $50,000, and costs. Mr. Brown received $500 damages for loss of consortium.
 

 On appeal, the Smiths contend the Browns were not entitled to an independent statutory remedy for sexual harassment on the grounds that the conduct alleged did not fall within the scope of either FEHA or the Act. The Smiths also challenge the admission of evidence showing other uncharged acts of a sexual harassment nature by Smith, and showing other, unrelated bad character evidence about him. In addition, the Smiths make several other arguments, to be described
 
 post
 
 as necessary.
 

 Although FEHA forbids sexual discrimination in housing, it does not enumerate sexual harassment as a type of discrimination subject to FEHA. (§ 12927, subd. (c).) The trial court here concluded that sexual harassment was a variety of sex discrimination within the scope of FEHA regulation. Since FEHA is remedial legislation which should be broadly construed to accomplish its stated purposes, and which should be read in conformity with federal housing law, we conclude the trial court did not err in making that determination. (§§ 12993, 12955.6). However, due to instructional error, the judgment in favor of the Browns must nevertheless be reversed for retrial under instructions which properly assist the jury in making the necessary factual determinations on this claim.
 

 We reach a different conclusion on the Unruh Civil Rights Act claim. As of the time of the conduct alleged (1991), sexual harassment by a landlord was not enumerated as a form of actionable sex discrimination under the Act. The Legislature remedied this omission in 1994 when it enacted Civil Code section 51.9, creating a separate statutory cause of action for sexual harassment in a business relationship, and we may thus conclude that these
 
 *775
 
 Unruh Civil Rights Act claims were not statutorily authorized at the time the operative events occurred here.
 

 On both the statutory issues, therefore, the judgment must be reversed. In addition, the judgment is infected by evidentiary error in that the trial court prejudicially erred in allowing extensive evidence of other uncharged bad conduct in contravention of the standards set forth in Evidence Code section 1101, subdivision (b),
 
 People
 
 v.
 
 Ewoldt
 
 (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757], and
 
 People
 
 v.
 
 Balcom
 
 (1994) 7 Cal.4th 414 [27 Cal.Rptr.2d 666, 867 P.2d 777]. Further proceedings may take place on remand on these evidentiary issues subject to the views set forth in this opinion.
 

 Factual and Procedural Background
 

 The Browns rented an apartment in a five-unit building owned by the Smiths in February 1991. For the first few months, Mrs. Brown had no indication Mr. Smith might give her any problems; she saw him around the building a few times a week and had a normal landlord-tenant relationship with him. He occasionally complimented her on her appearance, which she did not find harassing.
 

 At trial, Mrs. Brown testified that Mr. Smith’s behavior toward her began to change in May 1991. In June or July 1991, he made repeated comments to her of an offensive, sexual nature:
 

 “[H]e’d say that he loved Black women and he had lots of Black women —and that he, he wanted to have an affair with me and he wanted to have sex with me. He wanted to lick my pussy and suck my titties, and all those despicable things.
 

 “[H]e told me that I sure excite him, that my husband was a lucky guy and that he just want[ed] to have sex with me and there’s nothing wrong with a variety of women and, basically the same thing: he just wanted to, to lick my pussy and suck my titties. He was like a baby when it comes to sucking titties and it drives his wife crazy when he did oral sex on her. You know, things like that.”
 

 Brown rejected these advances and asked Smith to stop talking that way. Smith called Mr. Brown’s workplace to find out if he was away on military duty, and made many such comments while Mr. Brown was out of town on
 
 *776
 
 duty. At one point, Mrs. Brown had to go around Smith as he spoke to her, because he was blocking her path.
 

 In July, Smith offered to forgo a planned rent increase if Mrs. Brown would meet him “for fifteen, twenty minutes a week” in an empty apartment for sex. He told her he wanted to take her top off. Mrs. Brown refused. When she told her husband about these advances and asked him to confront Smith about his conduct, he refused to do so, which put a strain on their marriage. Mrs. Brown testified about the emotional distress she suffered due to Smith’s conduct. She called Mrs. Smith and complained about Mr. Smith’s conduct in July 1991, but Mrs. Smith responded, “Don’t call my house anymore. My husband is a good man.” The Browns moved to another apartment at the end of July 1991. She paid a deductible for counseling she received after the incidents.
 

 After making an administrative complaint under FEHA and receiving a right-to-sue letter, the Browns filed their complaint in July 1992. They alleged statutory causes of action under FEHA and the Act, as well as a negligence claim alleging emotional distress and loss of consortium by Mr. Brown.
 
 [3]
 
 In their answer and a motion for judgment on the pleadings, the Smiths challenged the viability of the statutory causes of action, and also argued that claim in their trial brief. The trial court rejected these challenges, although the FEHA claim against Mrs. Smith was dismissed for procedural reasons.
 

 In discovery, Brown disclosed she had talked to other tenants at the apartment building to see if they had had similar experiences, and found four women who had received sexual suggestions from Mr. Smith. The Smiths brought a motion
 
 in limine
 
 to exclude such testimony, as will be discussed in part IIA,
 
 post.
 

 At the outset of jury trial, the parties were informed that under section 68086, they were required to post $420 costs per day for the court reporter, for the anticipated six-day trial. Both counsel advised the court their clients were financially unable to pay this fee. The trial court responded that they would therefore be waiving their right to an effective appeal, although the court would determine whether to continue to have the reporter transcribe the proceedings for its own purposes but not for those of the parties. After the trial court decided to admit the testimony of the four female tenant/
 
 *777
 
 prospective tenant witnesses, the Smiths paid enough of the requested fee to have that portion of the testimony reported. Other portions were not. Thus, only a partial reporter’s transcript has been provided this court.
 

 After instruction and deliberation, the jury returned a verdict for Brown of $110,000 general damages. Mr. Brown received $500 damages for loss of consortium. The jury found against Mr. Smith on all theories and against Mrs. Smith under the Act and negligence claims. In bifurcated proceedings, $68,000 punitive damages were awarded against Mr. Smith. Statutory attorney fees of $50,000 were awarded under FEHA and the Act, as well as costs of $27,015.25. (§ 12989.2; Civ. Code § 52, subd. (a).)
 

 The Smiths brought a new trial motion and sought judgment notwithstanding the verdict, again challenging the applicability of both these statutory schemes to these allegations; the motions were denied. They appeal.
 

 Discussion
 

 We first turn our attention to the statutory issues argued on appeal to determine if the trial court correctly applied FEHA and the Act to these facts. We then address the evidentiary problems presented by this record. Finally, we discuss to the extent necessary the Smiths’ claim that an inadequate showing was made of Mrs. Smith’s liability, and the problems presented by the requirement in section 68086 for payment of court reporter costs.
 
 [4]
 

 I
 

 Statutory Claims
 

 To examine the validity of the Smiths’ challenges to the Browns’ statutory causes of action under FEHA and the Act, we apply well-established rules of statutory construction: We are to determine the intent of the Legislature by construing in context the language of the statute.
 
 (Harris
 
 v.
 
 Capital Growth Investors XIV
 
 (1991) 52 Cal.3d 1142, 1159 [278 Cal.Rptr. 614, 805 P.2d 873].) This includes reading the statutory scheme as a whole.
 
 (American Federation of State etc. Employees
 
 v.
 
 County of San Diego
 
 (1992) 11 Cal.App.4th 506, 515 [14 Cal.Rptr.2d 51].)
 

 “In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative
 
 *778
 
 purpose, i.e., the object to be achieved and the evil to be prevented by the legislation. [Citations; see
 
 Kizer
 
 v.
 
 Hanna
 
 (1989) 48 Cal.3d 1, 8 [255 Cal.Rptr. 412, 767 P.2d 679] (‘If a statute’s language is clear, then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.’).]”
 
 (Harris
 
 v.
 
 Capital Growth Investors XTV, supra,
 
 52 Cal.3d at p. 1159.)
 

 Where the plain meaning is not so evident, a court may consider both the legislative history of the statute and the wider historical circumstances of its enactment to ascertain legislative intent.
 
 (Dyna-Med, Inc.
 
 v.
 
 Fair Employment & Housing Com.
 
 (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) “ ‘[T]he construction of statutes and the ascertainment of legislative intent are purely questions of law. This court is not limited by the interpretation of the statute made by the trial court . . . .’ [Citation.]”
 
 (Bravo Vending
 
 v.
 
 City of Rancho Mirage
 
 (1993) 16 Cal.App.4th 383, 391-392 [20 Cal.Rptr.2d 164].) In general, remedial statutes are construed liberally to accomplish the evident purpose of the legislation.
 
 (People
 
 ex rel.
 
 Dept, of Transportation
 
 v.
 
 Muller
 
 (1984) 36 Cal.3d 263, 269 [203 Cal.Rptr. 772, 681 P.2d 1340].) With these general rules in mind, we first address the question of whether FEHA’s ban on sex discrimination in housing allows a plaintiff to seek redress on a claim of sexual harassment in housing, and then turn to the Unruh Act’s coverage, or lack thereof, of the same claim.
 
 [5]
 

 A
 

 FEHA’s Sex Discrimination Ban
 

 1.
 
 Statutory Background
 

 Brown’s complaint pled as its first cause of action a violation of section 12900 et seq., FEHA, and attached as an exhibit the right-to-sue letter she obtained as to Mr. Smith after filing an administrative complaint with the Department of Fair Employment and Housing. (As noted above, this claim was dismissed against Mrs. Smith for lack of pursuit of administrative remedies.) Smith attacked this claim in a variety of pretrial and posttrial motions, but the trial court consistently took the position that, even though no authority had been presented on this point, sexual harassment was necessarily a form of sexual discrimination and thus must fall within the terms of FEHA as to housing, even though not specifically articulated as such in the statute.
 

 As enacted in 1980, to reorganize employment and housing provisions from other codes, FEHA contains specific coverage of employment issues in
 
 *779
 
 sections 12940-12950 and 12960-12976, and specific coverage of housing issues at sections 12955 and 12980-12988. Regarding employment, the statute is quite specific in its coverage of sexual harassment: Section 12950 expressly prohibits sexual harassment in the workplace, and section 12940, subdivisions (h)(1) and (i), create an independent statutory cause of action for sexual harassment in the workplace.
 
 [6]
 

 With regard to housing, the main section involved here is section 12955, subdivision (a), providing in pertinent part: “It shall be unlawful: (a) For the owner of any housing accommodation to discriminate against any person because of the race, color, religion, sex, marital status, national origin, ancestry, familial status, or disability of that person.”
 

 As an aid to interpretation of FEHA, the Legislature provided a general statement of public policy in section 12920, referring to housing as follows: “[T]he practice of discrimination because of race, color, religion, sex, marital status, national origin, ancestry, familial status, or disability in housing accommodations is declared to be against public policy.”
 

 In section 12927, subdivision (c)(1), a definition of “discrimination” is set forth for use in construing the housing accommodations provisions: “ ‘Discrimination’ includes refusal to sell, rent, or lease housing accommodations; includes refusal to negotiate for the sale, rental, or lease of housing accommodations; includes representation that a housing accommodation is not available for inspection, sale, or rental when that housing accommodation is in fact so available; includes any other denial or withholding of housing accommodations; includes provision of inferior terms, conditions, privileges, facilities, or services in connection with those housing accommodations; includes the cancellation or termination of a sale or rental agreement; includes the provision of segregated or separated housing accommodations; includes the refusal to permit, at the expense of the disabled person, reasonable modifications of existing premises occupied or to be occupied by the
 
 *780
 
 disabled person, if the modifications may be necessary to afford the disabled person full enjoyment of the premises, except that, in the case of a rental, the landlord may, where it is reasonable to do so condition permission for a modification on the renter’s agreeing to restore the interior of the premises to the condition that existed before the modification (other than for reasonable wear and tear), and includes refusal to make reasonable accommodations in rules, policies, practices, or services when these accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling.”
 
 [7]
 

 2.
 
 Relationship of FEHA to Other Antidiscrimination Law
 

 Since neither section 12955 nor section 12927, subdivision (c) expressly speaks on the subject of sexual harassment, we look to the statutory scheme as a whole to determine if such harassment is a prohibited form of sexual discrimination.
 
 (American Federation of State etc. Employees
 
 v.
 
 County of San Diego, supra,
 
 11 Cal.App.4th at p. 515.) We find guidance for interpreting the general language of sections 12955 and 12927, subdivision (c) in a FEHA section entitled, “Construction with other laws,” section 12955.6, which provides as follows: “Nothing in this part shall be construed to afford to the classes protected under this part, fewer rights or remedies than the federal Fair Housing Amendments Act of 1988 (P.L. 100-430) and its implementing regulations (24 C.F.R. 100.1 et seq.), or state law relating to fair employment and housing as it existed prior to the effective date of this section. Any state law that purports to require or permit any action that would be an unlawful practice under this part shall to that extent be invalid. This part may be construed to afford greater rights and remedies to an aggrieved person than those afforded by federal law and other state laws.”
 
 [8]
 

 FEHA in the housing area is thus intended to conform to the general requirements of federal law in the area and may provide greater protection against discrimination. Further, in a miscellaneous section, section 12993, the Legislature set forth guidance for the construction of FEHA, both as to housing and employment: “(a) The provisions of this part shall be construed
 
 *781
 
 liberally for the accomplishment of the purposes thereof. Nothing contained in this part shall be deemed to repeal any of the provisions of the Civil Rights Law or of any other law of this state relating to discrimination because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, or age, unless those provisions provide less protection to the enumerated classes of persons covered under this part.”
 

 This section indicates that the Act questions are quite separate from the FEHA issues involved. (See pt. IB,
 
 post.)
 
 We accordingly turn to federal case law interpreting the federal housing statute, 42 United States Code section 3601 et seq. The operative section concerning housing discrimination is 42 United States Code section 3604(b), providing it is unlawful: “To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provisions of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.” This section, although general in nature, has been interpreted by the federal Courts of Appeals to prohibit sexual harassment in housing as a form of sex discrimination. In
 
 Honce
 
 v.
 
 Vigil
 
 (10th Cir. 1993) 1 F.3d 1085, 1089, the Court of Appeals flatly stated, “Harassment based on sex is a form of discrimination. [Citation.] We have previously recognized two distinct categories of sexual harassment: ‘quid pro quo’ harassment and hostile work environment (or housing environment) harassment. [Citation.]”
 
 [9]
 

 In
 
 DiCenso
 
 v.
 
 Cisneros
 
 (7th Cir. 1996) 96 F.3d 1004, the court summarized the law in this area: “Like the Tenth Circuit, we recognize a hostile housing environment cause of action, and begin our analysis with the more familiar Title VII standard. For sexual harassment to be actionable in the Title VII context, it must be sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.
 
 (Meritor [Savings Bank
 
 v.
 
 Vinson
 
 (1986)
 
 477
 
 U.S. 57 at [p.] 67 [106 S.Ct. 2399 2405-2406, 91 L.Ed.2d 49)].) ‘Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive-is beyond Title VII’s purview.’
 
 (Harris
 
 v.
 
 Forklift Systems, Inc.
 
 [(1993)] 510 U.S. 17, 21 [114 S.Ct. 367, 370, 126 L.Ed.2d 295].)
 
 Applied to the housing context, a claim is actionable ‘when the offensive behavior unreasonably interferes with use and enjoyment of the premises.’ (Honce
 
 [v.
 
 Vigil,
 
 
 *782
 

 supra,]
 
 1 F.3d at [p. ]1090.) Whether an environment is ‘hostile’ or ‘abusive’ can be determined only by looking at all the circumstances, and factors may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.
 
 (Harris
 
 [v.
 
 Forklift Systems, Inc., supra,]
 
 510 U.S. at [p.] 23 [114 S.Ct. at p. 371].)”
 
 (Id.
 
 at p. 1008, italics added.)
 

 In
 
 DiCenso
 
 v.
 
 Cisneros, supra,
 
 96 F.3d 1004 in analyzing a single incident of harassment, the court concluded, “Considering the totality of the circumstances in this case, we agree with the ALJ [administrative law judge] that DiCenso’s conduct was not sufficiently egregious to create an objectively hostile housing environment.”
 
 (Id.
 
 at p. 1009.)
 

 Further explaining the degree of severity of the conduct which is required in order for the harassing conduct to be actionable, the court in
 
 Honce
 
 v.
 
 Vigil, supra,
 
 1 F.3d at page 1090 stated: “The harassment must be ‘sufficiently severe or pervasive’ to alter the conditions of the housing arrangement. [Citation.] It is not sufficient if the harassment is isolated or trivial. [Citation.] ‘ “[C]asual or isolated manifestations of a discriminatory environment . . . may not raise a cause of action.” ’ [Citation.] The offensive acts need not be purely sexual; it is sufficient that they would not have happened but for claimant’s gender. [Citation.]”
 

 Similarly, in
 
 Beliveau
 
 v.
 
 Caras
 
 (C.D.Cal 1995) 873 F.Supp. 1393, 1397, the district court stated that it was “beyond question” that sexual harassment is a form of discrimination, and that the basic principles applicable in employment cases should also apply in the housing context. In light of these interpretations, and in light of the FEHA statutory scheme as a whole, we find it consistent with law and logic to read section 12955 as barring sexual harassment as a form of sexual discrimination in housing.
 
 [10]
 

 3.
 
 Statutory Cause of Action: Elements and Proof
 

 Having concluded the statutory scheme of FEHA covers this alleged conduct, we now turn our attention to the record in this case to determine if the judgment in favor of Brown may be upheld. This requires an examination both of the statutory elements of the cause of action, and of the
 
 *783
 
 jury instructions in this case.
 
 [11]
 
 We first set out the instructions given here: The trial court first told the jury plaintiff Brown had the burden of proving by a preponderance of the evidence all of the facts necessary to show Mr. Smith sexually harassed her, and the nature and extent of her damages. It also read the jury the relevant portion of section 12955 and gave it a negligence per se instruction, BAJI No. 3.45 (1992 rev.): “If you find that a party to this action violated [section 12955], the statute just read to you and that such violation was a cause of injury to another, you will find that such violation was negligence.”
 
 [12]
 
 The court then instructed the jury regarding the elements of sexual harassment, “In order to establish that she was a victim of sexual harassment, [Brown] must prove by a preponderance of the evidence that she was actually offended by the alleged conduct. [*][] [Brown] has alleged that the defendant sexually harassed her by engaging in verbal exchanges of a sexual nature. [Brown] has not established a claim of sexual harassment unless she proves that this alleged conduct was unwelcome.”
 

 To analyze the correctness of this approach, we first repeat the text of section 12955 which provides it is unlawful for the owner of any housing accommodation “to discriminate against any person because of the race, color, religion, sex, marital status, national origin, ancestry, familial status, or disability of that person.” A statutory cause of action arising under this section thus includes (1) the basic allegation of sex discrimination in housing. Case law has defined the additional elements of this cause of action as it applies to a hostile environment sexual harassment claim: (2) That plaintiff was subjected to unwelcome sexual harassment, defined as either unwelcome sexual advances or other unwelcome verbal or physical conduct of a sexual nature. Plaintiff must allege (3) that the offensive act would not have happened but for her or his gender, so that gender was a substantial factor in the claimed harassment. It also must be alleged (4) that the harassment complained of was sufficiently severe or pervasive so as to alter or interfere unreasonably with the conditions of the housing arrangement, that the conduct continued after a request by plaintiff that it stop, and that the offensive conduct arose out of or was closely related to the landlord-tenant relationship. Finally, (5) the plaintiff must allege injury, damage, or harm
 
 *784
 
 caused by the sexual harassment. (See
 
 Honce
 
 v.
 
 Vigil, supra,
 
 1 F.3d at p. 1090;
 
 DiCenso
 
 v.
 
 Cisneros, supra, 96
 
 F.3d at p. 1008; Sample Jury Instructions in a Sexual Harassment Case, in Sexual Harassment Litigation (PLI Litigation & Admin. Practice Course Handbook Series No. H4-5222 (1995)) pp. 559-572.)
 

 To assist the court or jury in deciding if the alleged conduct falls within the antidiscrimination statute, the United States Supreme Court has laid out these criteria: The nature of the environment as “hostile” or “abusive” can be determined “only by looking at all the circumstances,” and factors may include “the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance [or the tenant’s enjoyment of the housing conditions].”
 
 (Harris
 
 v.
 
 Forklift Systems, Inc.
 
 (1993) 510 U.S. 17, 23 [114 S.Ct. 367, 371, 126 L.Ed.2d 295].) Similar standards were stated in
 
 Fisher
 
 v.
 
 San Pedro Peninsula Hospital
 
 (1989) 214 Cal.App.3d 590, 610 [262 Cal.Rptr. 842]:
 

 “The factors that can be considered in evaluating the totality of the circumstances are: (1) the nature of the unwelcome sexual acts or works (generally, physical touching is more offensive than unwelcome verbal abuse); (2) the frequency of the offensive encounters; (3) the total number of days over which all of the offensive conduct occurs; and (4) the context in which the sexually harassing conduct occurred. [Citation.]
 

 “In determining what constitutes ‘sufficiently pervasive’ harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature. [Citation.]”
 

 It is for the trial court to make an initial determination if the plaintiff has stated a cause of action or a prima facie case of sexual harassment in housing. (See
 
 Honce
 
 v.
 
 Vigil, supra,
 
 1 F.3d at p. 1090;
 
 Beliveau
 
 v.
 
 Caras, supra,
 
 873 F.Supp. at pp. 1395-1396.) This is part of the court’s duty to resolve statutory interpretation questions, which are not to be sent to the jury. (Evid. Code, § 310, subd. (a); 58 Cal.Jur.3d, Statutes, § 94, pp. 450-451.) In general, “Instructions in the language of a statute should only be given ‘ “if the jury would have no difficulty in understanding the statute without guidance from the court.” ’ [Citations.]”
 
 (Lourence
 
 v.
 
 West Side Irrigation Dist.
 
 (1965) 233 Cal.App.2d 532, 538 [43 Cal.Rptr. 889].) Although instructions based on code sections should follow the language of the particular section at issue, the court should give explanatory instructions where the statutory wording is confusing or couched in legal terms.
 
 (Formosa
 
 v.
 
 Yellow Cab Co.
 
 (1939) 31 Cal.App.2d 77, 84 [87 P.2d 716].) “It is
 
 *785
 
 incumbent upon the trial court to determine whether or not a code section should be explained."
 
 (Ibid..;
 
 see also 59 Cal.Jur.3d, Trial, § 84, pp. 579-580.)
 

 In light of the above requirements for alleging this cause of action, the jury has the duty to determine whether the facts as alleged by the plaintiff have been proven, consistent with the approach of BAJI No. 2.60 on the plaintiff’s burden of proof and the preponderance of the evidence. Here, the jury was asked to determine whether Mr. Smith sexually harassed Brown and whether such conduct violated the statute and caused damage. It was told Brown had to prove she was actually offended by the alleged conduct and that it was unwelcome. It thus appears the jury was required to interpret and apply the statute to these facts. However, we may assume the trial court made an implied finding that there was a prima facie case stated and there was enough evidence to send the case to the jury.
 

 Even assuming this to be the case, these instructions failed to include the element of severe and pervasive conduct which continued after a request to stop, and failed to state that the conduct was directed at her because of her gender. The instructions also do not require a finding of a sufficient connection between the harassment and Smith’s status as landlord. These elements of the statutory cause of action could not reasonably have been known by the jury absent some statutory interpretation by the trial court in the form of jury instructions that go beyond the language of the statute (here, § 12955).
 
 (Lourence
 
 v.
 
 West Side Irrigation Dist., supra,
 
 233 Cal.App.2d at p. 538;
 
 Formosa
 
 v.
 
 Yellow Cab Co., supra,
 
 31 Cal.App.2d at p. 84.) It would have been appropriate and, we believe, necessary for the trial court to outline the same criteria as set forth in
 
 Harris
 
 v.
 
 Forklift Systems, Inc., supra,
 
 510 U.S. at page 23 [114 S.Ct. at page 371] and
 
 Fisher
 
 v.
 
 San Pedro Peninsula Hospital, supra,
 
 214 Cal.App.3d at page 610
 
 (ante,
 
 at p. 784) to assist the jury in making a factual determination as to whether the plaintiff has proved her or his case.
 

 The verdict rendered amounted to $110,500 in compensatory damages, as well as $68,000 in punitive damages, plus statutory attorney fees and costs. This was a substantial verdict and we believe the Smiths were prejudiced by the lack of more specific instructions on all the elements of such a statutory cause of action. The judgment cannot stand on the FEHA theory.
 

 In the Act context, a pattern jury instruction has recently been developed to outline the scope of a similar statutory protection:
 

 “BAJI No. 7.91 (1995 New) HD Sexual Harassment [^ (Civil Code, §51.9)
 

 
 *786
 
 “The plaintiff_ [also] seeks to recover damages based upon a claim of sexual harassment arising out of a business, service or professional relationship. [^Q The essential elements of such a claim are: [^D 1. There was a business, service or professional relationship between the plaintiff and defendant; [<fl] 2. The defendant has made sexual advances, solicitations, sexual requests or demands for sexual compliance by the plaintiff; [U 3. Such conduct by the defendant was unwelcome by the plaintiff and was persistent or severe, continuing after a request by the plaintiff to stop; [H 4. Plaintiff was unable to easily terminate the relationship without tangible hardship; and [][] 5. Such conduct by the defendant caused plaintiff to suffer [or will cause plaintiff to suffer,] injury, damage, loss or harm. [<][| A business, service or professional relationship includes [_(physician-patient, etc.)] [a relationship that is substantially similar to that of [_(physician-patient, etc.)].” (BAJI No. 7.91, (1995 new)(8th ed. pocket pt.).)
 

 We do not know the nature and extent of the evidence to be presented at any retrial of this matter and leave the formulation of jury instructions to the trial court. However, we commend to the court’s attention for comparison purposes, in addition to our discussion above, new BAJI No. 7.91, as discussed above.
 

 B
 

 The Act
 

 Brown’s complaint’s second cause of action pled a violation of the Act, based on her right to be free of housing discrimination based on sex and to be free of sexual harassment in a business establishment. Civil Code section 51 prohibits denial of access to public accommodations based on specified classifications, including sex. Brown’s theory is that the sexual harassment she testified she endured amounted to denial of ongoing access to her housing accommodations on the basis of her sex, since she was deprived of the quiet enjoyment of her home.
 

 In
 
 Harris
 
 v.
 
 Capital Growth Investors XIV, supra,
 
 52 Cal.3d at pages 1169-1175, the Supreme Court concluded that the Act did not include within its scope a cause of action for economic discrimination or a cause of action alleging sex discrimination based on disparate impact on women. The court stated that its judicial task was to ascertain the legal status of those claims under a general civil rights statute prohibiting discrimination in public accommodations because of race, sex, etc.
 
 (Id.
 
 at p. 1169.) The court concluded that the language and history of the Act show that it prohibits
 
 *787
 
 intentional discrimination in access to public accommodations.
 
 {Id.
 
 at p. 1149.)
 

 Here, Brown has effectively alleged an intentional tort in the guise of a statutory Unruh Civil Rights Act cause of action. However, since
 
 Harris
 
 v.
 
 Capital Growth Investors XIV, supra, 52
 
 Cal.3d 1142 courts have been reluctant to add new classifications to the Act’s list of protected classifications. For example, in
 
 Beaty
 
 v.
 
 Truck Ins. Exchange
 
 (1992) 6 Cal.App.4th 1455, 1463 [8 Cal.Rptr.2d 593], the court explained the holding of
 
 Harris,
 
 and decided the issue before it (i.e., was marital status included as an additional category of prohibited discrimination under the Act?), as follows: “Upon examining the history of the Unruh [Civil Rights] Act, the
 
 [Harris]
 
 court came to the unremarkable conclusion the Legislature intended the scope of the Unruh [Civil Rights] Act be confined to the types of discrimination specifically enumerated therein. [Citation.] While the
 
 Harris
 
 court refused to overrule prior case law which extended the Unruh [Civil Rights] Act to classifications not expressed in the statute [citation], the court made it clear future expansion of prohibited categories should be carefully weighed to ensure a result consistent with legislative intent. [Citations.] [<][] In light of
 
 Harris,
 
 we decline plaintiff’s invitation to expand the Unruh [Civil Rights] Act to include ‘marital status’ as an additional category of prohibited discrimination.”
 
 (Beaty
 
 v.
 
 Truck Ins. Exchange, supra,
 
 6 Cal.App.4th at p. 1462.)
 

 Essentially, Brown here is asking this court to expand the protected categories listed in the Act to include victims of sexual harassment. This would not be within the purpose and intent of the Act as explained in
 
 Harris
 
 v.
 
 Capital Growth Investors XIV, supra,
 
 52 Cal.3d 1142.
 

 Moreover, in 1994, the Legislature enacted Civil Code section 51.9, expressly to plug this hole in the civil rights law. That section, effective January 1, 1995, and amended in 1996, provides that a person is liable in a cause of action for sexual harassment where the plaintiff proves, inter alia: “There is a business, service, or professional relationship between the plaintiff and defendant. Such a relationship may exist between a plaintiff and a person, including, but not limited to, any of the following persons:
 

 “(D) Landlord or property manager.” (Civ. Code, § 51.9, subd. (a)(1)(D).)
 

 The section then sets forth other proof requirements. The legislative history of this section discloses that the Legislature’s intent was to create a cause of action where none had existed before: “Existing law makes it
 
 *788
 
 unlawful to harass an employee or employment applicant because of, among other things, sex. These provisions are enforced by the Department of Fair Employment and Housing. General provisions of existing law specify that all persons have the right to be free from violence or intimidation by threat of violence, against their persons or property, because of certain bases of discrimination.
 
 [%
 
 This bill would provide a cause of action for sexual harassment that occurs as part of a professional relationship, as specified.” (Legis. Counsel’s Dig., Sen. Bill No. 612 (1994 Reg. Sess.).)
 

 In general, statutes are prospective in application, not retrospective, unless a contrary legislative intent appears. (58 Cal.Jur.3d, Statutes, § 23, pp. 335-342.) The conduct alleged here took place in 1991. Accordingly, for all the reasons set forth above, we conclude Brown cannot state a cause of action for sexual harassment remedies under the Act.
 

 II
 

 Evidentiary Issues
 

 A
 

 Similar Uncharged Conduct: Evidence and Standards
 

 Based on Smith’s conduct, Brown made a complaint to FEHA about sexual harassment. FEHA personnel advised her to talk to other tenants at the apartment building to see if they had had similar experiences. The names of four such witnesses were on her witness list submitted during trial preparation.
 

 The Smiths brought a motion
 
 in limine
 
 to exclude the testimony of these witnesses about specific acts, offered to prove character or conduct. (Evid. Code, § 1101, subd. (b).) After initially granting the motion subject to reconsideration, the trial court in an unreported sidebar conference denied the motion
 
 in limine
 
 and the testimony was taken, as will be described. The record does not reveal that any limiting instructions were given regarding the uses to which this evidence could be put, even though the jury was generally instructed that evidence admitted for a limited purpose should only be used for that purpose. (BAJI No. 2.05.)
 

 All 4 plaintiffs’ witnesses on this topic were Black female tenants or prospective tenants at the Smiths’ buildings, ranging in age from 21 to the
 
 *789
 
 mid-40’s.
 
 [13]
 
 Some were recipients of governmental housing assistance under the section 8 program, and the Smiths’ apartments were on the section 8 list. (42 U.S.C. § 1437f.) All these women were currently unmarried, except for Etta Jean Taylor. She testified that when she met Smith to look into renting one of his apartments, he suggested they lie down on the filthy floor and have sex. She told him he was crazy and left. The next time she saw him, he asked her to serve some papers on a tenant nearby, without telling her they were eviction papers. After she did so, he told her he would not rent an apartment to her because she had too many evictions.
 

 Dorothy Williams, a widow, next testified that when she saw Smith about renting an apartment, he said that if she had sexual relations with him, she would not have to pay a deposit on the apartment. As he suggested this, he grabbed his genitals and shook them at her. Ms. Williams took the apartment but not on those terms, and later called Mrs. Smith to complain about Smith’s conduct. Williams first testified Smith evicted her after she talked to Brown about the situation, then changed her testimony to say it was the later owners, who bought the building from the Smiths, who evicted her. It was unclear from her testimony whether she had ever talked to anyone from the federal section 8 housing administration about Smith’s behavior.
 

 The next two witnesses were the only ones of this group of four witnesses and Mrs. Brown to testify that Smith touched them in connection with his overtures. Desoria Chattman testified that when she was looking at one of Smith’s apartments, he grabbed, hugged and kissed her, and grabbed her buttocks, without any invitation from her. He then asked her for a lunch date, which she took to be a joke. She took the apartment, from which he later evicted her. She did not tell anyone about the incident until Brown came to her door inquiring aboüt such incidents.
 

 Finally, Cynthia Phillips testified that Smith made passes at her and at her mother at the time she first moved into one of the Smiths’ apartments. He told her that both she and her mother were attractive, that he liked pretty Black women, hugged her and came around to see her for no reason. After Ms. Phillips filed a lawsuit against Smith to recover for injuries her daughter suffered on the property, Smith evicted her, and he also kept her damage deposit although she had left the apartment clean.
 

 After this testimony was received into evidence, Brown testified about her encounters with Smith in which he made offensive comments to her of a sexual nature and also suggested swapping sex for foregoing a rent increase.
 

 To evaluate whether the trial court erred or abused its discretion in admitting the testimony of these four witnesses, we turn to the interpretation
 
 *790
 
 of Evidence Code section 1101, subdivision (b), that is set forth in
 
 People
 
 v.
 
 Ewoldt, supra,
 
 7 Cal.4th 380: “Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person’s character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of [Evidence Code] section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person’s character or disposition.[
 
 14
 
 ] ... [TO ‘The presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done.’
 
 [Citation.]"(People
 
 v.
 
 Ewoldt, supra,
 
 7 Cal.4th at p. 393.)
 

 Thus, the Supreme Court has recognized that evidence of uncharged similar misconduct may be employed to establish a common design or plan.
 
 (People
 
 v.
 
 Ewoldt, supra, 1
 
 Cal.4th at p. 394.)
 
 [15]
 
 “[E]vidence of a common design or plan is admissible only to establish that the defendant engaged in the conduct alleged to constitute the charged offense, not to prove other matters, such as the defendant’s intent or identity as to the charged offense.” (7 Cal.4th at p. 406.) Compared to the amount of evidence of uncharged similar misconduct that may be used to show intent,
 

 “A greater degree of similarity is required in order to prove the existence of a common design or plan. As noted above, in establishing a common design or plan, evidence of uncharged misconduct must demonstrate ‘not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.’ [Citation.] . . .
 

 “To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar
 
 *791
 
 spontaneous acts, but the plan thus revealed need not be distinctive or unusual.”
 
 (People
 
 v.
 
 Ewoldt, supra,
 
 7 Cal.4th pp. 402-403.)
 

 Moreover, “[t]he circumstance that the uncharged offense occurred
 
 after
 
 the charged offense does not lessen its relevance in demonstrating the existence of a common design or plan.”
 
 (People
 
 v.
 
 Balcom, supra,
 
 7 Cal.4th at p. 425, original italics.)
 

 Under Evidence Code section 1101, subdivision (b), the admissibility of prior act evidence “ ‘depends upon three principal factors: (1) the
 
 materiality
 
 of the fact sought to be proved or disproved; (2) the
 
 tendency
 
 of the uncharged crime to prove or disprove the material fact; and (3) the existence of any
 
 rule
 
 or
 
 policy
 
 requiring the exclusion of relevant evidence.’ ”
 
 (People
 
 v.
 
 Robbins
 
 (1988) 45 Cal.3d 867, 879 [248 Cal.Rptr. 172, 755 P.2d 355], quoting
 
 People
 
 v.
 
 Thompson
 
 (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883], original italics.)
 

 The policy or rule referred to in the previous quote is primarily found in the provisions of Evidence Code section 352 and the weighing of the prejudicial effect of such evidence against its probative value. Where such objection is raised, it is the trial court’s duty to make such an evaluation before admitting the evidence. The court need not specifically articulate its weighing process, but the record must reflect the trial court has made an evaluation of the evidence.
 
 (People
 
 v.
 
 Padilla
 
 (1995) 11 Cal.4th 891, 924 [47 Cal.Rptr.2d 426, 906 P.2d 388].)
 

 Thus, even where Evidence Code section 1101 does not require exclusion of the evidence of a defendant’s uncharged misconduct, such as where that evidence is relevant to prove a relevant fact other than the defendant’s criminal or tortious disposition, a further inquiry under Evidence Code section 352 is required: “Evidence of uncharged offenses ‘is so prejudicial that its admission requires extremely careful analysis. [Citations.]’ [Citations.] ‘Since “substantial prejudicial effect [is] inherent in [such] evidence,” uncharged offenses are admissible only if they have
 
 substantial
 
 probative value.’ [Citation.]’’
 
 (People
 
 v.
 
 Ewoldt, supra,
 
 7 Cal.4th at p. 404, original italics.)
 

 Thus, ‘“[e]vidence that involves crimes other than those for which a defendant is being tried is admitted only with caution . . . .’ [Citation.]"
 
 (People
 
 v.
 
 Balcom, supra,
 
 7 Cal.4th at p. 426.) Where the connection between the uncharged offense and the ultimate fact in dispute is not clear, the court should exclude the evidence.
 
 (People
 
 v.
 
 Daniels
 
 (1991) 52 Cal.3d 815, 856 [277 Cal.Rptr. 122, 802 P.2d 906].)
 

 
 *792
 
 Under these standards, our task will be to compare the degree of similarity among the various witnesses’ accounts, and to analyze the probative versus prejudicial effect of the evidence under Evidence Code section 352, with attention to the elements of a successful sexual harassment claim.
 

 B
 

 Evidence Code Section 352 Factors Regarding Issues in Dispute
 

 Where evidence of uncharged similar conduct is similar in some respects to the charged conduct, a specific inquiry must be made. That is, a three-pronged test has been developed for considering admissibility of evidence of uncharged bad acts under Evidence Code section 1101, subdivision (b): “(1) the
 
 materiality
 
 of the fact sought to be proved or disproved; (2) the
 
 tendency
 
 of the uncharged crime to prove or disprove the material fact; and (3) the existence of any
 
 rule
 
 or
 
 policy
 
 requiring the exclusion of relevant evidence.’ [Citation.]”
 
 (People
 
 v.
 
 Robbins, supra,
 
 45 Cal.3d at p. 879, original italics.)
 

 Another three-pronged test applies to the subsequent Evidence Code section 352 weighing process in this area, in considering the probative versus prejudicial value of the evidence: The
 
 tendency
 
 of the evidence to demonstrate the existence of a common design or plan, the extent to which the
 
 source
 
 of the uncharged evidence is independent of the charged offense evidence, and the circumstance of whether the uncharged acts resulted in
 
 criminal convictions. (People
 
 v.
 
 Ewoldt, supra,
 
 7 Cal.4th at pp. 404-405.) To apply these tests, we first consider what the uncharged act evidence was offered to prove: Brown was sexually harassed at her housing, pursuant to Smith’s common scheme or plan. As discussed in part I,
 
 ante,
 
 we have found the FEHA statutory scheme authorized this cause of action as of the time of these events, although the Act did not. This was therefore actionable conduct, and we are thus required to discuss the evidentiary issues as an independent ground of review.
 

 Our analysis of this evidentiary question is complicated by several features of this record: The trial court first granted the motion
 
 in limine
 
 to exclude all this evidence, and then reversed its ruling in an unreported sidebar conference, so we do not have a record of the trial court’s reasoning nor is it clear if renewed Evidence Code section 352 objections were specifically raised and ruled upon (although those issues were thoroughly discussed in the
 
 in limine
 
 hearing). Secondly, the trial court only gave a general instruction about limited purpose evidence, and did not restrict the jury’s consideration of this evidence in any other way. Finally, evidence was
 
 *793
 
 admitted not only about Smith’s sexual harassment-type conduct, but also unrelated bad acts (“manipulating” Taylor to unknowingly serve eviction papers, evicting Phillips after she sued him, and supposedly evicting Williams as retaliation for talking to Brown [although it was actually the later owners who did so]).
 

 First, on a procedural note, we are aware of the parties’ financial straits which made them decide to provide only a partial record on this appeal. However, the portion of the record containing the disputed testimony was reported, and it would have been the better practice for the trial court to set forth its reasoning for reversing its previous ruling in which it determined to keep this evidence out as it was “sort of right on the edge” of admissibility. The trial court indicated it would be performing a balancing of the probative value of the evidence versus its prejudicial nature, if the evidence were later to be heard, but the nature of that balancing is not evident on this record.
 

 On this record, we decline to find any waiver by Smith of these issues, in view of the heavily litigated
 
 in limine
 
 motion and the unusual procedure used here. (See
 
 People
 
 v.
 
 Padilla, supra,
 
 11 Cal.4th at p. 924;
 
 Sacramento, etc. Drainage Dist.
 
 ex rel.
 
 State Reclamation Bd.
 
 v.
 
 Reed
 
 (1963) 215 Cal.App.2d 60,67 [29 Cal.Rptr. 847].) Rather, we consider whether the record shows the court made an effort to evaluate the potential prejudice as opposed to the probative value of the evidence, and whether any effort was made to ameliorate any prejudice that might occur. We first compare the types of conduct testified to, in light of the purpose for which the evidence was admitted, and then apply the tests referred to above.
 

 Brown testified that Smith made vulgar remarks and suggestions while she was in and around her apartment unit over a period of one or two months while she was already a tenant; there was no physical touching. The testimony of the four other witnesses was that Smith’s comments, propositions and other conduct occurred during their initial interviews, at a Smith apartment, before they had rented an apartment from him. In bald detail, the four witnesses testified that Smith, as to each of them:
 

 (a) Taylor: Suggested having sex at the initial interview; no apartment rented; no suggestion of sex in exchange for getting the apartment. (Taylor also gave evidence that he had her serve eviction papers on a tenant.)
 

 (b) Williams: Suggested having sex at the initial and a second interview in exchange for waiving the deposit; grabbed genitals and shook them; no further harassment during tenancy; she may have told a federal section 8 housing representative about the conduct. (Williams also gave evidence that the later owners evicted her.)
 

 
 *794
 
 (c) Chattman: Grabbed, hugged and kissed her at their initial interview, grabbed her buttocks, and invited her to lunch; no further harassment during tenancy.
 

 (d) Phillips: Made flattering comments to her and her mother at initial interview, hugged her, and invited her on a date while her mother was present. (Phillips also gave evidence that he evicted her after being sued.)
 

 The first inquiry under Evidence Code section 1101, subdivision (b) is whether this evidence goes to a material fact.
 
 (People
 
 v.
 
 Robbins, supra,
 
 45 Cal.3d at p. 879.) Brown has alleged intentional sexual harassment in connection with her housing, and the evidence was offered toward proving that theory. However, it is possible to find within this evidence a more innocuous pattern of Smith’s sexual attraction to Black females between the ages of 20 and 40. Such attraction does not necessarily amount to sexual harassment absent additional elements of coercion, unsolicited sexual attention, abuse of his status as landlord, and the like. Findings on this issue would have been helpful, but in any case, we believe there is enough on this record to support an implied finding that the evidence was specifically directed at proving the material facts concerning the sexual harassment theories, and Smith has focused mainly on the remaining elements of the test.
 

 Secondly, it must be considered whether the evidence has a tendency to prove the material facts.
 
 (People
 
 v.
 
 Robbins,
 
 45 Cal.3d at p. 879.) Brown alleged a much more ongoing series of harassing acts than did the other witnesses, although all the alleged acts vary quite a bit in terms of frequency and intensity. Thus, the question arises whether these witnesses have each testified to the type of conduct that has been found actionable, in terms of severity and intensity. (See our discussion of this area in part IA,
 
 ante,
 
 regarding the FEHA claims and jury instructions.) Brown’s allegations already include the type of continuing course of conduct as is described in
 
 Fisher
 
 v.
 
 San Pedro Peninsula Hospital, supra,
 
 214 Cal.App.3d at page 610. As to Brown, this conduct took place over approximately a two-month period and cannot be fairly characterized as spontaneous or isolated acts. However, it does not appear that the trial court here made any effort to inquire into whether the totality of the circumstances, as applied to the four witnesses, showed the necessary repeated or routine pattern either (1) as to the witnesses as individuals, or (2) as to the witnesses as part of an overall group of tenants or prospective tenants, such that gender was a substantial factor in the claimed harassment. A threshold legal ruling on this issue would be necessary before the court could perform the balancing required under Evidence Code sections 352 and 1101, subdivision (b). Otherwise, it is
 
 *795
 
 not clear what the scope of the supposed “common scheme or plan” is alleged to be. The record does not reflect how the trial court evaluated the evidence.
 
 (People
 
 v.
 
 Padilla, supra,
 
 11 Cal.4th at p. 924.)
 

 Further, as to the four witnesses as individuals, while we in no way condone the vulgar and offensive conduct that is conceded to have occurred to some extent (at least, it is conceded for purposes of argument on appeal), the trial court should make a record about whether the conduct would have interfered with a reasonable tenant’s normal expectations of a landlord-tenant relationship. In Chattman’s case, she thought some of Smith’s comments were a joke. For their own reasons, which could have been economic or otherwise unrelated to Smith’s conduct, three of these witnesses went ahead and rented units from Smith, even after his comments at their initial interviews. The trial court should have made some inquiry into and a record concerning the severity of this alleged harassment, before making the determination that the uncharged acts tended to prove the material facts alleged by Brown (Evid. Code, § 1101, subd. (b)), and the related determination of prejudice. (See
 
 Harris
 
 v.
 
 Forklift Systems, Inc., supra,
 
 510 U.S. at p. 23 [114 S.Ct. at p. 371];
 
 DiCenso
 
 v.
 
 Cisneros, supra,
 
 96 F.3d at pp. 1008-1009 [one incident of a landlord’s caressing a tenant’s arm and back and inviting her to trade sex for rent was not sufficiently egregious to create an objectively hostile housing environment under the Fair Housing Act, 42 United States Code section 3601 et seq.].)
 

 Further, in weighing the probative value against the prejudicial nature of the evidence (Evid. Code, § 352), the trial court should have considered the extent to which the evidence had an independent source, and the fact that there were no other criminal convictions or tort judgments arising out of Smith’s conduct.
 
 (People
 
 v.
 
 Ewoldt, supra,
 
 7 Cal.4th at pp. 404-405.) The record is void on this point.
 
 (People
 
 v.
 
 Padilla, supra,
 
 11 Cal.4th at p. 924.) It appears that none of the four witnesses had made formal or administrative complaints to housing agencies, although Williams thought she might have done so (but her deposition testimony was that she had not), and Brown had searched out these witnesses to support her case. Those factors may weigh against admissibility on any retrial, depending on the other factors considered.
 
 [16]
 

 Moreover, the trial court gave no indication of why the evidence of unrelated misconduct was relevant to any issue before the court: evidence of Taylor’s being told unknowingly to serve eviction papers, and evidence of
 
 *796
 
 evictions on other grounds of Williams and Phillips. Smith contends this evidence was merely general character assassination, contrary to the requirements of Evidence Code section 1101, subdivision (b), and we tend to agree.
 

 In conclusion, we have very little indication of how or whether the trial court performed the necessary balancing of factors under both Evidence Code sections 352 and 1101, subdivision (b). This was a relatively large verdict, $110,500 compensatory damages and $68,000 punitive damages with substantial fees and costs, and it is more probable than not that the evidentiary basis for the verdict was not sound for the reasons discussed above.
 
 [17]
 
 The judgment must be reversed on this basis.
 

 Ill
 

 Remaining
 

 *
 

 Disposition
 

 The judgment is reversed. All parties shall bear their own costs.
 

 Nares, J., and McIntyre, J., concurred.
 

 [2]
 

 All statutory references are to the Government Code unless otherwise noted.
 

 [3]
 

 The parties’ briefs refer to this claim as negligent infliction of emotional distress, but it is actually pled as simple negligence, not a more specialized theory. (See
 
 Marlene F.
 
 v.
 
 Affiliated Psychiatric Medical Clinic, Inc.
 
 (1989) 48 Cal.3d 583, 588 [257 Cal.Rptr. 98, 770 P.2d 278].)
 

 [4]
 

 Mr. Brown’s loss of consortium claim stands or falls with Mrs. Brown’s substantive claims, and our discussion of Mrs. Brown’s theories will suffice for Mr. Brown as well.
 

 [5]
 

 Before oral argument was set, we obtained supplemental briefing on the issues of the relationship of FEHA and the Act to federal housing law. (§§ 12993, 12955.6.)
 

 [6]
 

 Section 12940, subdivision (h) forbids harassment of an employee or applicant based on the specified protected categories, including sex. For purposes of this subdivision, subsection (3)(C) defines “harassment” because of sex as including “sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions.” Section 12940, subdivision (i) then makes it unlawful “[f]or an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Other related provisions set forth allowable discovery limits in employment sexual harassment cases (§ 11440.40), and administrative hearing evidence restrictions in such cases (§ 11513, subd. (c)). (Also see Cal. Code Regs., tit. 2, § 7287.6, subd. (b)(1)(D), giving a rule definition of sexual harassment in the employment context, and Gov. Code, § 12926, subd. (o), defining “sex” in the employment context as referring to pregnancy and childbirth and related medical conditions.)
 

 [7]
 

 Section 12927, subdivision (c)(2) then sets forth a definition of what is not such discrimination: “ ‘Discrimination’ does not include either of the following: [<1 (A) Refusal to rent or lease a portion of an owner-occupied single-family house to a person as a roomer or boarder living within the household, provided that no more than one roomer or boarder is to live within the household, and the owner complies with subdivision (c) of Section 12955, which prohibits discriminatory notices, statements, and advertisements. HO (B) Where the sharing of living areas in a single dwelling unit is involved, the use of words stating or tending to imply that the housing being advertised is available only to persons of one sex.”
 

 [8]
 

 The federal Fair Housing Amendments Act of 1988 (Pub.L. No. 100-430 (Sept. 13, 1988) § 13(a), 102 Stat. 1636) has been codified in 42 United States Code section 3601 et seq. in the Fair Housing Act.
 

 [9]
 

 Here, Brown is alleging the “hostile environment” form of sexual harassment in housing, not the “quid pro quo” form (e.g., where the housing is conditioned on unwelcome sexual advances; see
 
 Accardi
 
 v.
 
 Superior Court
 
 (1993) 17 Cal.App.4th 341, 348 [21 Cal.Rptr.2d 292]).
 

 [10]
 

 Other state courts have interpreted their housing accommodations statutes as allowing a statutory cause of action to redress sexual harassment. (See Annot., State Civil Rights Legislation Prohibiting Sex Discrimination in Housing (1990) 81 A.L.R.4th 205, § 3, referring to
 
 Gnerre
 
 v.
 
 Com’n Against Discrimination
 
 (1988) 402 Mass. 502 [524 N.E.2d 84, 81 A.L.R.4th 195];
 
 Chomicki
 
 v.
 
 Wittekind
 
 (1985) 128 Wis.2d 188 [381 N.W.2d 561].)
 

 [11]
 

 Jury instructions which are erroneous on a material element of law are deemed excepted to even absent any objection at trial.
 
 (Manguso
 
 v.
 
 Oceanside Unified School Dist.
 
 (1984) 153 Cal.App.3d 574, 577-582 [200 Cal.Rptr. 535].) Instructional error in a civil case is prejudicial where it is probable that the error prejudicially affected the verdict.
 
 (Soule
 
 v.
 
 General Motors Corp.
 
 (1994) 8 Cal.4th 548, 580-581 [34 Cal.Rptr.2d 607, 882 P.2d 298].) This determination is made by taking into account whether the party was able to place his full case before the jury, the state of the evidence, the effect of other instructions and counsel’s arguments, and any jury questions.
 
 (Ibid.)
 

 [12]
 

 All further references to jury instructions are to BAJI (8th ed. 1994 bound volume) unless otherwise noted.
 

 [13]
 

 At the time of these events, Brown was 34 years of age.
 

 [14]
 

 In a footnote at this point the court set forth the text of Evidence Code former section 1101: “(a) Except as provided in this section and in [Evidence Code] Sections 1102 and 1103, evidence of a person’s character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [H (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness.”
 
 (People
 
 v.
 
 Ewoldt, supra,
 
 7 Cal.4th at p. 393, fn.l.)
 

 [15]
 

 The same evidentiary rules apply in both civil and criminal case concerning evidence of other uncharged misconduct. (1 Witkin, Cal. Evidence (3d ed. 1986) Circumstantial Evidence, § 385, pp. 358-360.)
 

 [16]
 

 We do not decide today the extent to which the testimony of these four witnesses may be admissible at any retrial, leaving that determination to the trial court based on the factors presented at that time.
 

 [17]
 

 In light of the reversal ordered, we need not discuss the Smiths’ claims the damages awarded were excessive as a matter of law. The judgment against Mr. Smith based on negligence or FEHA is reversed due to the evidentiary error discussed above.
 

 *
 

 See footnote 1,
 
 ante,
 
 page 767.