Filed 5/12/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ROBERT SMITH, | |
| Plaintiff and Appellant, | E073174 |
| v. | (Super. Ct. No. CIVDS1820485) |
| BP LUBRICANTS USA INC. et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of San Bernardino County. John M. Tomberlin, Judge. Affirmed in part, reversed in part.

Lyon Law and Geoffrey C. Lyon, for Plaintiff and Appellant.

Wilson Turner Kosmo, Lois M. Kosch and Martina M. Nagle, for Defendants and Respondents.

# I.

# INTRODUCTION

Robert Smith's employer, Najjar Lube Centers, Inc. dba Jiffy Lube, held a presentation for its employees to learn about a new Castrol product. Castrol employee Gus Pumarol led the presentation. Smith alleges that Pumarol made several comments to Smith during the presentation that he considered racist and offensive. Smith sued BP Lubricants USA, Inc. dba Castrol (BP) and Pumarol for harassment under the Fair Employment and Housing Act (Gov. Code §§ 12940 et seq. (FEHA)) and for discrimination under the Unruh Act (Civ. Code, § 51, subd. (b)). Smith also sued Pumarol for intentional infliction of emotional distress (IIED). The trial court sustained BP and Pumarol's demurrer without leave to amend, and Smith timely appealed.

We reverse the judgment. We affirm the trial court's order sustaining BP and Pumarol's demurrer to Smith's FEHA claim without leave to amend. We conclude, however, that Smith sufficiently alleged claims for IIED and violation of the Unruh Act. We therefore reverse the trial court's orders sustaining BP and Pumarol's demurrer to those claims without leave to amend.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Smith, who is African American, worked for Jiffy Lube for almost two decades. During that time, he was passed over for promotions and criticized because of his race. Smith alleges Jiffy Lube harassed and discriminated against him because he is African American.

In September 2017, Jiffy Lube "held a company presentation to discuss and teach employees about a new product from Castrol." About 50 Jiffy Lube employees attended the presentation, which Pumarol led. Before the presentation, Smith introduced himself to Pumarol, and Pumarol encouraged him and his colleagues to ask questions.

Smith asked a question during the presentation, and Pumarol responded, "'Huh. Speak up. I can't hear you.'" Smith spoke again, and Pumarol said, "'You sound like Barry White.'" All non-African Americans in attendance laughed, including three of Smith's superiors, Jiffy Lube owner Elias Najjar, Human Resources Director Martha Villalobos, and Head of Operations and Jiffy Lube co-owner Cruz Martinez. Smith was offended by Pumarol's comment, which he thought had a racial connotation.

---

[1] The following facts, which we assume are true, are drawn from Smith's Complaint and First Amended Complaint (FAC). (*Stevens v. Superior Court* (1999) 75 Cal.App.4th 594, 601.)

Later during his presentation, Pumarol said, "'I don't like taking my car to Jiffy Lube because I've had a bad experience with a mechanic putting his hands all over my car. How would you like Barry White over there with his big banana hands working on your car?'" All non-African Americans in attendance, including Najjar, Villalobos, and Martinez, laughed again. Smith was offended by Pumarol's "racially motivated comment" because he thought Pumarol referenced a banana because Smith is African American.

Even so, Smith asked Pumarol another question. Pumarol responded, "'What, I can't see your eyes, what?'" Again, all non-African Americans in attendance, including Najjar, Villalobos, and Martinez, laughed at Pumarol's comment. And again, Smith was offended by Pumarol's comment, which he believed suggested that he could not see Smith's "eyes because [he] is African American with a dark complexion."

The next day, a Jiffy Lube employee crossed out Smith's name on the schedule and replaced it with "'Banana Hands.'" Smith complained to Martinez about Pumarol's comments. Martinez replied that Pumarol "'didn't mean it like that.'"

Smith then complained to Najjar, who also said Pumarol "'didn't mean it'" and noted that Pumarol "'said something similar at a previous meeting.'" Najjar continued: "'Let's push this under the carpet and I'm going to take care of it. This is not going to hurt Castrol, this is going to hurt me and [Martinez]. And you didn't want to hurt me, I took care of you. And you don't want to hurt [Martinez].'" Smith told Najjar that he felt discriminated against at Pumarol's presentation. Najjar replied, "'I've been discriminated

4

before and you just have to let it go.'"  Smith responded, "'I'm tired.  I'm done.  I want to drive off the freeway.'"  In the ensuing weeks, Smith suffered significant physical and mental health problems because of his "work-related issues," which required medical attention.

Smith later sued, alleging various claims against several defendants.  In his Complaint, he alleged BP and Pumarol violated FEHA's prohibition on racial harassment in the workplace by "aiding and abetting" Jiffy Lube's harassment and discrimination against him.  He also sued Pumarol for IIED, and sued both Pumarol and BP for racial discrimination under the Unruh Act (Civ. Code, § 51).[2]

BP and Pumarol demurred to Smith's Complaint.  The trial court sustained the demurrer without leave to amend as to Smith's Unruh Act claim, but granted Smith leave to amend his other claims.  Smith realleged his FEHA and IIED claims in his operative FAC, and BP again demurred.  The trial court sustained the demurrer without leave to amend and entered judgment for BP and Pumarol.  Smith timely appealed.

---

[2]  Smith also sued Jiffy Lube and two of his supervisors.  His claims against those defendants are not relevant to the issues on appeal.

5

III.

DISCUSSION

Smith contends the trial court erroneously sustained BP's demurrers without leave to amend. We disagree as to his FEHA claim, but agree as to his IIED and Unruh Act claims.

A. *Applicable Law and Standard of Review*

"'A trial court's order sustaining a demurrer without leave to amend is reviewable for abuse of discretion "even though no request to amend [the] pleading was made." [Citation.] While it is the plaintiff's burden to show "that the trial court abused its discretion" and "show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading" [citation], a plaintiff can make "such a showing . . . for the first time to the reviewing court" [citation].'" (*Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1072.) Thus, "[t]o meet this burden, a plaintiff must submit a proposed amended complaint or, on appeal, enumerate the facts and demonstrate how those facts establish a cause of action. [Citations.] Absent such a showing, the appellate court cannot assess whether or not the trial court abused its discretion by denying leave to amend." (*Cantu v. Resolution Trust Corp.* (1994) 4 Cal.App.4th 857, 890.)

We "liberally construe[]" a complaint's allegations. (*CLD Construction, Inc. v. City of San Ramon* (2004) 120 Cal.App.4th 1141, 1146.) "'On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of

6

review is well settled.  The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.]  The court does not, however, assume the truth of contentions, deductions or conclusions of law.  [Citation.]  The judgment must be affirmed "if any one of the several grounds of demurrer is well taken.  [Citations.]" [Citation.]  However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory.  [Citation.]  And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment.  [Citation.]' [Citation.]" (*McAllister v. Los Angeles Unified School Dist.* (2013) 216 Cal.App.4th 1198, 1206.)

"If the court sustained the demurrer without leave to amend, as here, we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment.  [Citation.]  If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred.  [Citation.]  The plaintiff has the burden of proving that an amendment would cure the defect.  [Citation.]" (*Shifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

B.  *FEHA Claim*

Smith argues the trial court improperly sustained BP and Pumarol's demurrer to his FEHA claim without leave to amend because he sufficiently pled facts showing that BP and Pumarol aided and abetted Jiffy Lube's harassment and discrimination against him.  We disagree.

We first reject BP and Pumarol's argument that they cannot be liable under FEHA because they were never Smith's employer.  FEHA prohibits "any person" from aiding or abetting workplace discrimination.  (Gov. Code, § 12940, subd. (i).)  For that reason, individuals and entities who are not the plaintiff's employer may be liable under FEHA for aiding and abetting the plaintiff's employer's violation of FEHA.  (See *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 389-390 (*Alch*) [holding talent agencies that did not employ the plaintiffs could be liable for aiding and abetting their employers' alleged "systemic discrimination" in violation of FEHA].)

"FEHA does not provide a definition of 'aiding and abetting,'" (*Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1325), but it has been interpreted as "closely allied" with conspiracy.  (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 78.)  "The common basis for liability for both conspiracy and aiding and abetting . . . is concerted wrongful action."  (*Ibid*.)  Aiding and abetting thus "involves two separate persons, one helping the other."  (*Id*. at p. 77.)  It is "unlawful, for example, for third parties such as customers or suppliers to induce or coerce prohibited discrimination or harassment."  (*Ibid*.)

8

Thus, BP and Pumarol are liable under FEHA for aiding and abetting Jiffy Lube's alleged harassment and discrimination against Smith only if (1) Jiffy Lube subjected Smith to discrimination and harassment, (2) BP and Pumarol knew that Jiffy Lube's conduct violated FEHA, and (3) BP and Pumarol gave Jiffy Lube "substantial assistance or encouragement" to violate FEHA. (*Alch*, *supra*, 122 Cal.App.4th at p. 389 ["A talent agency would be liable for aiding and abetting an employer's violation of FEHA if the agency knew the employer's conduct violated FEHA and gave 'substantial assistance or encouragement to the [employer] to so act.'"].)

Smith's allegations fail to satisfy the second and third element. Nowhere in the FAC does Smith allege that BP and Pumarol knew of Jiffy Lube's alleged harassment and discrimination against Smith. (See *Alch*, *supra*, 122 Cal.App.4th at p. 390 [plaintiffs stated aiding and abetting FEHA claim in part because their "complaints clearly allege the agencies knew the employers were engaged in systemic discrimination"].) Nor does Smith allege that Pumarol knew Jiffy Lube's conduct violated FEHA or that he gave Jiffy Lube substantial assistance or encouragement to Jiffy Lube's alleged violations of FEHA. (See *ibid*. [plaintiffs stated aiding and abetting FEHA claim in part because they alleged talent agencies knowingly gave substantial assistance to employers' FEHA violations].)

Simply put, Smith's FAC has no facts suggesting concerted activity between Jiffy Lube, BP, and Pumarol to commit FEHA violations, which is the crux of an aiding abetting claim under FEHA. (See *Janken v. GM Hughes Electronics*, *supra*, 46 Cal.App.4th at p. 78; *Alch*, *supra*, 122 Cal.App.4th at p. 390.) Smith therefore failed to

9

allege sufficient facts that would support a finding that BP or Pumarol could be liable for aiding and abetting Jiffy Lube's FEHA violations. Smith makes no attempt to explain how he could amend the FAC to cure its deficiencies. We therefore conclude the trial court properly sustained BP and Pumarol's demurrer to Smith's FEHA claim without leave to amend. (See *Shifando v. City of Los Angeles*, *supra*, 31 Cal.4th at p. 1081 [plaintiff bears burden on appeal of showing how complaint can be amended to state a valid claim].)

C. *IIED Claim*

To state an IIED claim, the plaintiff must allege facts showing: ""'(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.''" (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.) The parties dispute only whether Pumarol's comments amount to "extreme and outrageous conduct."

"'Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.'" (*Christensen v. Superior Court*, *supra*, 54 Cal.3d at p. 903.) "[M]ere insulting language, without more, ordinarily would not constitute extreme outrage" unless it is combined with "aggravated circumstances." (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 499 (*Alcorn*).) But "[b]ehavior may be considered outrageous if a defendant (1) abuses a relation or position which gives

10

him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946 (*Agarwal*), disapproved on other grounds by *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574 fn. 4.)

Citing *Agarwal*, *supra*, 25 Cal.3d 932 at page 941, Smith argues whether conduct qualifies as extreme and outrageous is always a question for the jury. *Agarwal* does not stand for that proposition, and several courts have held that alleged conduct is not extreme and outrageous as a matter of law. (E.g., *Marsh v. Anesthesia Services Medical Group, Inc.* (2011) 200 Cal.App.4th 480, 487 [upholding sustaining of demurrer because plaintiff could not allege facts showing outrageous conduct]; *Lawler v. Montblanc North America, LLC* (9th Cir. 2013) 704 F.3d 1235, 1245 [affirming summary judgment on IIED claim because conduct was not outrageous as a matter of law].) That said, whether conduct is outrageous is "'usually' a question of fact." (*Barker v. Fox & Associates* (2015) 240 Cal.App.4th 333, 356.)

Our Supreme Court holds that an IIED claim can stem from the use of racial epithets if coupled with aggravating circumstances. For instance, in *Alcorn*, *supra*, 2 Cal.3d at pages 497 to 498, the plaintiff's foreman shouted at the plaintiff, "'You goddam "ni—ers" are not going to tell me about the rules. I don't want any "ni—ers" working for me. I am getting rid of all the "ni—ers."'" The plaintiff was later fired. (*Id*. at pp. 497-498.)

11

Our Supreme Court held the plaintiff "alleged facts and circumstances which reasonably could lead the trier of fact to conclude that defendants' conduct was extreme and outrageous." (*Alcorn*, *supra*, 2 Cal.3d at p. 498.) The court explained that "[a]lthough it may be that mere insulting language, without more, ordinarily would not constitute extreme outrage, the aggravated circumstances alleged by plaintiff seem sufficient to uphold his complaint as against [a] general demurrer." (*Id*. at p. 499, fn. omitted.) The court reasoned that "'[w]here reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.' [Citations.]" (*Ibid*.)

In *Agarwal*, our Supreme Court upheld a jury's verdict for IIED based on similar allegations. (*Agarwal*, *supra*, 25 Cal.3d at p. 938.) An assistant manager told the plaintiff, "'[y]ou black ni—er, member of an inferior race, get out and do it,'" and "'[y]ou son-of-a-bitch, I am going to terminate you.'" (*Id*. at pp. 938, 941-942.) The assistant manager later induced the plaintiff's employer to fire him by making false statements about him. (*Id*. at pp. 938, 941-942.) Our Supreme Court held that the jury reasonably found that the manager's conduct was extreme and outrageous. (*Id*. at p. 947.)

Under *Alcorn* and *Agarwal*, a rational juror could find Pumarol's conduct was extreme and outrageous. Smith alleges that Pumarol made three offensive comments to him in front of about 50 of his colleagues, including three of his supervisors. According

to Smith, after Pumarol made the first comment, everyone except for African American employees laughed, yet Pumarol made two more comments that Pumarol found offensive. Pumarol allegedly said that he would not want Smith's "'Banana Hands'" on his car and that he could not see Smith, which Smith construed as an unwelcome, racist comment about his dark complexion.

On these facts, a reasonable jury could find that Pumarol "act[ed] intentionally or unreasonably with the recognition that [his] acts [were] likely to result in illness through mental distress." (*Agarwal*, *supra*, 25 Cal.3d at p. 496.) The jury could thus reasonably find that Pumarol's conduct was extreme and outrageous. Because Pumarol does not dispute that Smith sufficiently alleged the remaining elements of an IIED claim, we conclude Smith stated a valid claim for IIED against Pumarol. The trial court erred in finding otherwise.

D. *Unruh Act*

The Unruh Act "prohibits intentional discrimination in access to public accommodations." (*Brown v. Smith* (1997) 55 Cal.App.4th 767, 786-787 (*Brown*).) The Unruh Act only applies to "business establishments" that are "generally open to the public" (*In re Cox* (1970) 3 Cal.3d 205, 216), and mandates that those establishments "serve all persons without arbitrary discrimination." (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 167.) The Unruh Act therefore does not cover "discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers." (*Alcorn*, *supra*, 2 Cal.3d at p.

13

500.)  Put another way, the Unruh Act is "confined to discriminations against recipients of the 'business establishment's . . . goods, services or facilities.'"  (*Isbiter v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 73, 83 fn. 12.)  Unruh Act claims are thus "appropriate where the plaintiff was in a relationship with the offending organization similar to that of the customer in the customer-proprietor relationship."  (*Strother v. Southern California Permanente Medical Group* (9th Cir. 1996) 79 F.3d 859, 874.)

BP and Pumarol contend the Unruh Act does not apply here because Pumarol made his alleged comments in a private business meeting not open to the public that only Jiffy Lube employees attended for training purposes.  BP and Pumarol also argue that because Smith's Unruh Act claim depends solely on Pumarol's comments, it asserts a claim for racial harassment, not racial discrimination.  In support, they rely mainly on *Brown*, *supra*, 55 Cal.App.4th 767, which held that sexual harassment is not actionable under the Unruh Act.  BP and Pumarol argue that, by extension, racial harassment is likewise not actionable under the Unruh Act.

*Brown* is distinguishable.  In that case, a tenant alleged that her landlord "made repeated comments to her of an offensive, sexual nature."  (*Brown*, *supra*, 55 Cal.App.4th at pp. 775.)  She sued him under the Unruh Act, arguing that he violated her "right to be free of housing discrimination based on sex and to be free of sexual harassment in a business establishment."  (*Ibid*.)

14

The *Brown* court held that the tenant's claim was not cognizable under the Unruh Act for two reasons. First, *Brown* relied on our Supreme Court's direction that courts generally should not expand the Unruh Act's reach beyond the enumerated categories of discrimination it expressly prohibits. (See *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, superseded by statute on other grounds as stated in *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 668.) The *Brown* court therefore declined "to expand the protected categories listed in the [Unruh] Act to include victims of sexual harassment." (*Brown*, *supra*, 55 Cal.App.4th at p. 787.) Second, *Brown* concluded that the Legislature enacted Civil Code section 51.9, which prohibits landlords from sexually harassing their tenants, "to plug th[e] hole" in the Unruh Act. (*Ibid*.)

We do not find *Brown* persuasive or controlling here. Civil Code section 51.9, enacted decades after the Unruh Act, expressly provides a cause of action for a tenant whose landlord sexually harasses him or her. From this, we can presume that the Legislature did not intend for the Unruh Act to cover tenants who are victims of their landlords' sexual harassment. (See *Arbuckle–College City Fire Protection Dist. v. County of Colusa* (2003) 105 Cal.App.4th 1155, 1166 ["Generally, it can be presumed that when the Legislature has enacted a specific statute to deal with a particular matter, it would intend the specific statute to control over more general provisions of law that might otherwise apply."].) But there is no specific statute enacted after the Unruh Act that covers Smith's Unruh Act claim in the way Civil Code section 51.9 covered the

15

*Brown* plaintiff's Unruh Act claim. Nothing in later enacted legislation can be construed to "plug[] [a] hole" in the Unruh Act. (*Brown*, *supra*, 55 Cal.App.4th at p. 787.)

*Brown* also rests on a flawed premise that sexual harassment is not a form of sex discrimination, which the Unruh Act prohibits. "[S]exual harassment . . . is merely one form of sex discrimination." (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 90.)[3] Moreover, the Unruh Act "can be violated in a number of ways by words alone." (*Long v. Valentino* (1989) 216 Cal.App.3d 1287, 1297.) It can also be violated by a business establishment's unequal treatment of its patrons on impermissible grounds. (*Pizarro v. Lamb's Players Theatre* (2006) 135 Cal.App.4th 1171, 1174.) It follows that the Unruh Act can be violated by verbal sexual harassment alone if it amounts to a business establishment treating its patrons unequally. We thus disagree with *Brown* that verbal sexual harassment can never provide grounds for an Unruh Act claim.

As a result, we reject BP and Pumarol's argument that Smith cannot state a valid claim under the Unruh Act because it is based only on Pumarol's alleged verbal harassment. We also disagree with BP and Pumarol that it is material whether Smith's Unruh Act claim is labeled "racial harassment" or "racial discrimination." Just as sexual harassment is a form of sex discrimination, racial harassment is a form of race discrimination. (See *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 129

---

[3] We acknowledge that sexual harassment and sex discrimination are legally distinct concepts in other circumstances not present here. (See *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 115 ["Sex discrimination . . . and sexual harassment are 'distinct causes of action' under the FEHA. [Citations.]"].)

16

["One form of employment discrimination is harassment on the basis of race"].) Whatever Smith's claim is labeled, the question is whether Pumarol's alleged comments violated the Unruh Act.

Smith alleges that Pumarol made three racist comments to him, which made every non-African American employee at the presentation laugh each time. In other words, Smith alleges that Pumarol treated him differently—and unequally—because of his race. Smith therefore alleged a valid Unruh Act claim so long as Pumarol's making the comments, if proven true, would amount to intentional discrimination "made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers." (*Alcorn*, *supra*, 2 Cal.3d at p. 500; *Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 618 [Unruh Act "established the right of all persons to nondiscriminatory treatment by establishments that engage in business transactions with the public."].)

We conclude that it would. We must interpret the Unruh Act's "coverage 'in the broadest sense reasonably possible.'" (*Isbiter v. Boys' Club of Santa Cruz*, *supra*, 40 Cal.3d at p. 76.) This principle applies to our analysis of whether Pumarol acted as a "business establishment" when giving his presentation. (See *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 795 [Unruh Act "'leaves no doubt that the term "business establishment" was used in the broadest sense reasonably possible.'"].)

BP and Pumarol do not dispute that Castrol, Pumarol's employer, is a business establishment. But they argue that Pumarol was not acting as a "business establishment" when he made his alleged comments because his presentation was not open to the public. We disagree.

Whether a defendant is a "business establishment" is an issue of law that we may decide. (*Rotary Club of Duarte v. Bd. of Directors* (1986) 178 Cal.App.3d 1035, 1050.) "The term 'business' '"embraces everything about which one *can* be employed, and it is often synonymous with 'calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain.'"' [Citation.] The word 'establishment' is also broadly defined to include not only fixed locations, but also a permanent commercial force or organization. [Citation.]" (*Harris v. Mothers Against Drunk Driving* (1995) 40 Cal.App.4th 16, 21.)[4]

According to the Smith's complaints, Pumarol gave his presentation to Jiffy Lube employees as a representative of Castrol. The purpose of his presentation was to train Jiffy Lube employees on a Castrol product. About 50 Jiffy Lube employees attended the presentation, including three of Smith's supervisors, one of which was the Jiffy Lube's owner. Pumarol encouraged Jiffy Lube employees, including Smith, to ask questions

---

[4] To support his argument that Pumarol acted as a business establishment, Smith relies heavily on decades-old federal district court cases holding that public schools are business establishments under the Unruh Act. While this appeal was pending, our colleagues in the First District, Division One, held as a matter of first impression for the California appellate courts that public schools are not business establishments under the Unruh Act. (*Brennon B. v. Superior Court of Contra Costa County* (2020) 57 Cal.App.5th 367, at *1, rev. granted Feb. 25, 2021, S266254.) Our Supreme Court granted review. (*Ibid*.)

18

during his presentation. Liberally construing Smith's allegations, we can reasonably infer that Pumarol's presentation was intended to ensure Jiffy Lube's employees knew how to properly use Castrol's product, thereby promoting it. In this context, Jiffy Lube's employees, including Smith, were effectively Castrol's "clients, patrons or customers." (*Alcorn*, *supra*, 2 Cal.3d at p. 500; *Strother v. Southern California Permanent Medical Group*, *supra*, 79 F.3d at p. 873 [an individual may bring Unruh Act claims against business establishment so long as the individual is a "recipient [] of the 'business establishment's . . . goods, services or facilities'"].)

Although the Unruh Act "does not apply to truly private social clubs," (*Warfield v. Peninsula Golf & Country Club*, *supra*, 10 Cal.4th at p. 617), it does apply to business establishments that are "generally open to the public." (*In re Cox*, *supra*, 3 Cal.3d at p. 216.) The parties agree that Castrol, Pumarol's employer, is a business establishment. And because Pumarol was acting on Castrol's behalf during his presentation, which was intended to educate Jiffy Lube's employees about a Castrol product, he acted as a "business establishment" while giving his presentation. (See *Harris v. Mothers Against Drunk Driving*, *supra*, 40 Cal.App.4th at p. 21 ["business establishment" under Unruh Act includes "permanent commercial forces"].)

That Pumarol's presentation was not open to the public does not change our conclusion. Again, Castrol is "generally open to the public," and Pumarol was acting as its representative during his presentation about a Castrol product. BP and Pumarol do not cite, and we cannot locate, any authority that suggests the Unruh Act stops at the doors of

19

a business establishment generally open to the public simply because its doors are closed to some, but not all of its "clients, patrons or customers," when the alleged discrimination occurs. If that were the case, then business establishments could discriminate against their customers without offending the Unruh Act so long as the discrimination occurred at an event or location open to only a select group of its customers.

Interpreting the Unruh Act in such a way would conflict with its "broad remedial purpose and overarching goal of deterring discriminatory practices by businesses." (*White v. Square, Inc.* (2019) 7 Cal.5th 1019, 1025.) The Unruh Act protects all recipients of a business establishment's services wherever provided. (See *Alch*, *supra*, 122 Cal.App.4th at p. 391 [Unruh Act "on its face" forbids business establishments from discriminating in the provision of its services].) That Smith was "not denied anything" is not dispositive, as BP and Pumarol contend, because the Unruh Act mandates "equal treatment of patrons in *all aspects* of the business." (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 29-30, italics added.) The Unruh Act does not require that a victim of business establishment's discriminatory, unequal treatment be denied services or demand equal treatment to state a claim under the Act. (See *Angelucci v. Century Supper Club*, *supra*, 41 Cal.4th at p. 168.)

For instance, in *Hutson v. The Owl Drug Co.* (1926) 79 Cal.App. 390, the African American plaintiff was allowed to sit at a soda fountain, but the employee "placed [her order] amongst dirty dishes on the counter," and another employee then struck the plaintiff and threw a cup of coffee on her. (*Id*. at p. 392.) The plaintiff suffered physical

20

injuries from the assault, as well as "great humiliation and embarrassment." (*Ibid*.) The *Hutson* court held that the defendant violated the Unruh Act because the plaintiff "was not accorded the same accommodations, advantages, facilities and privileges" on account of her race, even though she was not denied any services. (*Ibid*.) It was the unequal, discriminatory treatment she received that was actionable under the Unruh Act. (*Ibid*.)

Similarly, in *People v. McKale* (1979) 25 Cal.3d 626 at page 637, the People alleged "'a pattern of discriminative conduct'" by defendant against some of its tenants because of their ethnic or religious background, "varying from instances of abusive language . . . to discriminative sales and leasing policies." Our Supreme Court held that the defendant's alleged conduct was "clearly unlawful" under the Unruh Act. (*Ibid*.)

*Hutson v. The Owl Drug Co.*, *supra*, 79 Cal.App. 390 and *People v. McKale*, *supra*, 25 Cal.3d 626, which our Supreme Court cited approvingly in *Koire v. Metro Car Wash*, *supra*, 40 Cal.3d at page 29, show that a business establishment's unequal, race-based treatment of its customers is unlawful under the Unruh Act—even if its customers are not denied services. This is true whether the discriminatory treatment is verbal, physical, or financial. Thus, in the context of alleged racial discrimination, the dispositive question under the Unruh Act is whether the plaintiff faced unequal treatment on account of his or her race that members of other races did not experience.

Smith alleges Pumarol treated him differently from his non-African American colleagues by making offensive, humiliating comments to him because of his race. Given our conclusion that Pumarol qualified as a "business establishment" when giving

21

his presentation, Smith plausibly alleged that Pumarol treated him differently during the presentation in violation of the Unruh Act by making offensive, racist comments to him only.  (See *Pizarro v. Lamb's Players Theatre*, *supra*, 135 Cal.App.4th at p. 1174 ["[T]he [Unruh] Act applies not merely in situations where businesses exclude individuals altogether, but also where treatment is unequal."].)

We must interpret the Unruh Act liberally "with a view to effectuating its purposes." (*Koire v. Metro Car Wash*, *supra*, 40 Cal.3d at p. 28.)  The Unruh Act's overarching purpose is "to create and preserve 'a nondiscriminatory environment in California business establishments by 'banishing' or 'eradicating' arbitrary, invidious discrimination by such establishments.' [Citations.]" (*White v. Square, Inc.*, *supra*, 7 Cal.5th at p. 1025.)  To conclude that Smith cannot state a claim under the Unruh Act because Pumarol's comments amounted to only harassment, as BP and Pumarol urge us to do, would not further the Unruh Act's purpose of guaranteeing Californians ""full and equal" access to "all business establishments."" (*Ibid.*)  To hold that a business establishment cannot face liability under the Unruh Act for its racially harassing conduct toward its customers would thwart the Unruh Act's "broad remedial purpose and overarching goal of deterring discriminatory practices by businesses." (*Ibid.*)  We therefore reverse the trial court's order sustaining BP and Pumarol's demurrer to Smith's Unruh Act claim without leave to amend.

IV.

DISPOSITION

The judgment is reversed.  The trial court's order sustaining BP and Pumarol's demurrer to Smith's FEHA claim without leave to amend is affirmed, but its orders sustaining the demurrer to Smith's IIED and Unruh Act claims are reversed.  The parties shall bear their own costs on appeal.

CERTIFIED FOR PUBLICATION

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.

23